GRAYS HARBOR MOTORSHIP CORPORA-
TION v. UNITED STATES.

No. B–12.

Court of Claims.

Dec. 1, 1930.

274

Cletus Keating, of New York City (Staunton Williams and H. Maurice Fridlund, both of New York City, on the brief), for plaintiff.

W. W. Scott, of Washington, D. C., and Herman J. Galloway, Asst. Atty. Gen. (I. V. McPherson, E. O. Hanson, and C. M. Charest, all of Washington, D. C., on the brief), for the United States.

Before BOOTH, Chief Justice, and LITTLETON, GREEN, and WILLIAMS, Judges.

WILLIAMS, Judge.

The plaintiff is a corporation organized under and by virtue of the laws of the state of Washington, with its executive offices and main place of business in the city of Seattle, Wash.

During the years 1917 and 1918, the plaintiff entered into five contracts with the United States Shipping Board Emergency Fleet Corporation for the construction of a total of twenty-five wooden ship hulls.

The plaintiff during the years 1918 and 1919 fully completed all the hulls, seventeen in number, covered by the first four contracts, to wit, contracts No. 7 W. H., No. 148 W. H., No. 148 W. H. supplemental A, and No. 148 W. H. supplemental B, and completed four of the eight hulls covered by contract No. 468 W. H.

The twenty-one hulls completed as aforesaid were all delivered to the defendant, and accepted by it during the taxable years 1918 and 1919, except hull No. 2679, the Agathon,

which was destroyed by fire at about the time of its completion. The plaintiff, however, was compensated for the loss of this hull through insurance carried on the same, and it is in no way an issue in this suit.

Four of the eight hulls covered by contract No. 468 W. H. were not completed; the contract as to them being canceled and suspended by the United States Shipping Board Emergency Fleet Corporation on November 23, 1918. Just compensation for the loss sustained by reason of the partial cancellation and suspension of this contract is plaintiff's first cause of action.

The plaintiff in 1917 entered into a contract with the defendant, machinery installation contract No. 1, which contract provided for the installation by the plaintiff of propelling machinery and auxiliary equipment in the eight wooden hulls covered by contract No. 7 W. H. and contract No. 148 W. H. This contract was fully executed by the plaintiff.

In 1918 the plaintiff entered into another machinery installation contract with the defendant, contract No. 35 M. I., whereby the plaintiff was to install the propelling machinery in the seventeen remaining hulls covered by the several hull construction contracts above set out. Under this contract the plaintiff installed machinery in nine out of the seventeen hulls and did not make installation in the remaining eight, as the contract as to them was, on April 21, 1919, canceled and suspended by the defendant.

The plaintiff's second cause of action is a claim for just compensation for the loss it sustained by reason of the partial cancellation and suspension of this contract.

For the third cause of action the plaintiff says there is due it the sum of $30,393.30 for miscellaneous services rendered by the plaintiff in the performance of its several contracts for which it has not been compensated.

The plaintiff in its petition states a fourth cause of action growing out of the failure of the defendant to fully perform a contract which it has entered into with one McGee, on June 24, 1919, which contract had been assigned by McGee to the plaintiff, under the terms of which the defendant had agreed to supply the said McGee with 5,000,000 feet of lumber at a price of $17.50 per thousand feet board measure. The plaintiff claims there is due it under this claim the sum of $28,734.13.

As a fifth cause of action, the plaintiff claims it has overpaid its taxes in the sum of $103,231.06 for the year 1918, and has overpaid its taxes in the sum of $213,155.34 for the taxable year 1919, which sums it seeks to recover with interest from the dates of payment.

The plaintiff concedes that, against the total of its claims under the several causes of action set out in its petition, the defendant is entitled to the following credits: (1) $122,888.23 for cash advanced by the defendant, December 1, 1919, on account of the plaintiff's claims arising out of the partial cancellation of contract No. 468 W. H., and M. I. No. 35; (2) the sum of $77,000, the amount of the initial payment made to the plaintiff upon the execution of contract No. 468 W. H., as provided by the terms of the contract; (3) the sum of $14,000 for materials purchased at various times by the plaintiff from the defendant; and (4) the sum of $24,100, the amount realized by the plaintiff on the sale of materials on hand after the cancellation of the aforesaid contracts.

The amount claimed by the plaintiff as due it under its several causes of action, exclusive of interest claimed as a part of the just compensation to which it is entitled because of the partial cancellation of its contracts, and exclusive of interest on the sums alleged to be overpayments of its taxes for the years 1918 and 1919, aggregates $637,515.60.

The defendant has filed a counterclaim in the sum of $2,778,482.10, consisting of the following items:

1. Repairs on hulls necessary on account of defective construction ............... $409,807.97
2. Bills receivable............ 501,218.08
3. Construction cost, U. S. S. Blackford .............. 684,775.63
4. Lumber sold and delivered... 44,259.21
5. Cancellation of materials converted ................. 208,421.21
6. Unpaid taxes and penalties.. 930,000.00

These claims and counterclaims are presented in a voluminous record consisting of 165 exhibits and more than 1,000 pages of printed testimony. The contentions of the respective parties have been ably presented by counsel in oral argument and in elaborate briefs. The numerous questions of fact involved and their complicated nature have necessarily made the statement of ultimate facts as set out in the findings quite lengthy, and a restatement of these facts in detail, further than is absolutely necessary, will be avoided in our discussion of the issues presented.

Under the provisions of the Act of June 15, 1917, c. 29, § 1 (40 Stat. 182), the President of the United States was authorized to place orders with any person for ships or material as the necessities of the government might require during the period of the war. The act also authorized the President to modify, suspend, or cancel such contracts.

The President, by an executive order, dated July 11, 1917, delegated to the United States Shipping Board Emergency Fleet Corporation all the powers conferred upon him by the above act, so far as applicable to the construction of ships, or the requisitioning of vessels, material for ship construction, or contracts for the construction of ships.

Under this delegation of power from the President, the United States Shipping Board Emergency Fleet Corporation had authority to make the several contracts with the plaintiff hereinbefore set out, and likewise had the authority to suspend or cancel the same.

The plaintiff's direct loss because of the partial cancellation of contract No. 468, exclusive of interest and prospective profits (finding 12), is as follows:

1. Hull plant (finding 19)..... $ 37,012.35
2. Cancellation materials (invoice finding 11) less withdrawals and sales (findings 16 and 18).............. 198,021.14
3. Care of and storing cancellation materials (finding 14) 16,872.22
4. Incidentals ................ 25,000.00

$276,905.71

Its loss because of the cancellation and suspension of machinery installation contract No. 35, exclusive of interest on or prospective profits (finding 24), is as follows:

1. Machinery installation plant.. $52,135.03
2. Incidentals ................ 10,000.00

$62,135.03

There is due the plaintiff on miscellaneous items in controversy the following amounts:

1. For clinch rings paid for by plaintiff and not received (finding 12) ............. $ 3,809.75
2. For work on a vessel of the defendant (finding 26) .... 241.23
3. For extra work on hull No. 1893 (finding 27) ........ 230.44
4. For extra work performed by the Todd Dry Dock Company on defendant's hull No. 1062 and erroneously charged to the plaintiff (finding 28) ............. 1,966.25
5. For an erroneous overhead charge to plaintiff on account of work done by the Pacific Construction Co. on defendant's hull No. 1892 (findings 29 and 30) ...... 336.59
6. For balance withheld on contract price for construction of hull No. 1895 (finding 32) ................. 5,000.00
7. For additional work on hulls Nos. 1893 and 1895 (finding 33) ................... 1,436.34
8. For extra work on hulls Nos. 2677, 2678, and 2680 (finding 34) ................ 2,340.00
9. For waterproofing tarpaulin used on hatch cover of hull No. 1894 (finding 35) .... 260.74
10. For freight demurrage paid by the plaintiff (finding 36) 571.65
11. For classification fee paid Lloyds on S. S. Gray Cloud (finding 37) ............. 874.25
12. For repairs to S. S. Kenosha (finding 38) ............. 36.90
13. On account of increased price to the plaintiff of locust wood squares (finding 39) 4,503.87
14. For quantity of ship's felt furnished to Ames Ship Building Corporation by plaintiff at defendant's request (finding 40) ........ 1,075.20
15. On account of money paid by plaintiff to Seattle Plumbing Supply Co. on cancellation of order for valves made at the defendant's direction (finding 41) ...... 1,600.00
16. On account of increased freight rates on materials (finding 42) ............. 11,783.50

$36,066.71

The following counterclaims presented by the defendant are not supported by any competent proof:

1. Repairs on hulls necessary on account of defective construction (findings 57, 58, and 60) ................. $409,807.97
2. Bills receivable (finding 51) .. 501,218.08
3. Construction cost of S. S. Blackford (findings 62 and 63) ................... 684,735.63
5. Cancellation of materials converted .................. 208,421.21

There is due the defendant on its counterclaim No. 4, the Magee lumber contract (findings 43, 44, and 45), the sum of $19,763.22.

The Act of June 15, 1917 (40 Stat. 183), provides:

"Whenever the United States shall cancel, modify, suspend or requisition any contract, make use of, assume, occupy, requisition, acquire or take over any plant or part thereof, or any ship, charter, or material, in accordance with the provisions hereof, it shall make just compensation therefor. * * *"

The Supreme Court has defined just compensation for the taking of property to be the value of such property at the time of the taking, plus such additional amount as will produce the full equivalent of that value paid contemporaneously with the taking. It has also held that interest at the proper rate is the measure by which the amount to be added may be ascertained.

In Seaboard Air Line Railway v. United States, 261 U. S. 299, 43 S. Ct. 354, 356, 67 L. Ed. 664, the court said:

"The compensation to which the owner is entitled is the full and perfect equivalent of the property taken. * * * It rests on equitable principles and it means substantially that the owner shall be put in as good position pecuniarily as he would have been if his property had not been taken.

" * * * The requirement that 'just compensation' shall be paid is comprehensive and includes all elements and no specific command to include interest is necessary when interest or its equivalent is a part of such compensation. Where the United States condemns and takes possession of land before ascertaining or paying compensation, the owner is not limited to the value of the property at the time of the taking; he is entitled to such addition as will produce the full equivalent of that value paid contemporaneously with the taking. Interest at a proper rate is

a good measure by which to ascertain the amount so to be added. * * *

"The addition of interest allowed by the District Court is necessary in order that the owner shall not suffer loss and shall have 'just compensation' to which he is entitled."

In Phelps v. United States, 274 U. S. 341, 47 S. Ct. 611, 612, 71 L. Ed. 1083, the court said:

"Judgment in 1926 for the value of the use of the property in 1918 and 1919, without more, is not sufficient to constitute just compensation. Section 177 [of the Judicial Code (28 USCA § 284)] does not prohibit the inclusion of the additional amount for which petitioner contends. It is not a claim for interest within the purpose or intention of that section. * * * The government's obligation is to put the owners in as good position pecuniarily as if the use of their property had not been taken. They are entitled to have the full equivalent of the value of such use at the time of the taking paid contemporaneously with the taking."

██ The just compensation to which the plaintiff is entitled in this case is the amount of the direct loss resulting to it because of the cancellation of the two contracts, at the time of the cancellation, less the credits due the defendant thereon, with such additional amount as will put the plaintiff in as good a position pecuniarily as it would have been had its total loss been paid contemporaneously with the cancellation of the contracts.

The plaintiff's total loss attributable to the cancellation of the two contracts amounts, exclusive of interest and anticipated profits, to $339,040.74. It is conceded the defendant is entitled to credit on this amount for $77,000, the amount received by the plaintiff upon the execution of contract No. 468 W. H., and for the sum of $122,888.23, the amount awarded to the plaintiff on November 11, 1919, on account of cancellation claims. This leaves $139,152.51 of the amount of the plaintiff's direct loss growing out of the cancellation of the contracts due and unpaid.

The proper measure of the additional amount necessary to give the plaintiff just compensation is interest at the rate of 6 per cent. on the amount of its total loss, treating the items of $77,000 and $122,888.23 as partial payments of the said amount in computing such interest. The additional amount required, computed in this manner, is $108,519.97, which makes the just compensation now due the plaintiff attributable to its loss by reason of the cancellation of the said contracts the sum of $247,732.48.

The controversy between the plaintiff and the defendant as to the plaintiff's tax liabilities for the years 1918 and 1919 turns on two issues:

(1) What is the proper method of reporting the income received by the plaintiff on its seven government contracts during the years 1918 and 1919?

(2) Should the loss sustained by the plaintiff on the four barkentines which it built for sale be deducted from income for the year 1919 or the year 1920?

During the years 1918 and 1919 the plaintiff was engaged on work on seven separate and distinct contracts with the government. Five of these contracts had to do with the construction of wooden hulls, and two covered the installation of propelling machinery in the said hulls.

Each of the five hull contracts provided for the payment to the plaintiff of a fixed and stated sum for the construction of each hull; said sum was due and payable in fixed and stated amounts as the construction work progressed; the balance of the contract price of each hull was due and payable when such hull had been completed, delivered to, and accepted by the defendant. Likewise, the two machinery installation contracts provided for a fixed and definite profit for the installation of machinery in each hull.

The plaintiff kept its books of account on the accrual basis. Its books showed the cost of constructing each hull and also the cost incurred in the installation of machinery in each hull, such costs being shown separately.

Upon the completion and delivery of each hull, the books of account and the records of the plaintiff reflected the cost, the gross receipts, and net profit accrued or arising out of the construction of such hull, and the installation of machinery in such hull, and, at the close of each taxable year involved, the said books of account reflected the profits realized by the plaintiff in the construction of all hulls completed and accepted by the defendant during such taxable year, together with the profit realized in connection with the installation of machinery in each hull so completed, delivered, and accepted.

The plaintiff's original tax return for the year 1918 was made upon the basis on which its books of accounts were kept. It included in its return for that year all profits received by it on all vessels completed, delivered, and accepted during the year, except as to the vessel Brompton (hull No. 999, covered in contract No. 148 W. H.). Upon the reaudit of

the plaintiff's tax return, it was ascertained that the said vessel was in fact completed, delivered, and accepted by the defendant during the year 1918, and the Commissioner of Internal Revenue included the profit realized by the plaintiff upon the said vessel in plaintiff's income for 1918. The correctness of the Commissioner's determination that the vessel ·Brompton was completed, delivered, and accepted during the year 1918 is not questioned.

For the year 1919, the plaintiff on its original income tax return reported all profits derived from vessels completed, delivered, and accepted during the year, except as to four vessels constructed, delivered, and accepted under hull contract No. 468 ·W. ·H., which contract had been canceled as to four vessels. The profits realized on the four vessels which were completed, delivered, and accepted during the year 1919 covered by the said contract were reported by the plaintiff in its tax return for the year 1920.

Upon the reaudit of the plaintiff's tax return and its tax liability for the year 1919, the Commissioner of Internal Revenue included in income for the year 1919 all profits realized in connection with the four vessels completed and accepted under contract No. 468 W. H. during the year 1919, and also the amount awarded to the plaintiff by the government in ·1919 upon the cancellation of contracts.

The plaintiff on December 13, 1919, filed an amended return for the year 1918, showing a tax liability of $160,218.91, and on June 21, 1921, filed an amended return for 1920, showing a tax liability for that year of $63,761.31.

The plaintiff on November 3, 1924, filed amended returns for the years 1918, 1919, and 1920, in which returns all income derived by the plaintiff on its several government contracts for the years 1918 and 1919 was withheld pending a final determination of the various claims and counterclaims involved in this suit. The amended returns are made on the "completed contract" method; it being the contention of the plaintiff that under this method it can withhold the reporting of receipts from each of its seven contracts until they have all been completed, and that such contracts are not completed until all the claims and disputed matters growing out of each of them have been determined.

The amended returns filed November 3, 1924, are based on the theory that none of the plaintiff's seven contracts with the government were. completed during the years 1918 and 1919, and that they will not be completed until the exact amount of compensation due the plaintiff, on account of the cancellation in part of two of the contracts, and all other claims and matters in dispute between the parties growing out of the several contracts have been definitely settled; that, until these matters have been adjusted, it cannot be shown whether the plaintiff realized a profit or sustained a loss in connection with the said contracts; and that, pending the ascertainment of such facts, the plaintiff may withhold the reporting for tax purposes the income derived from any and all said contracts.

Article 334 of Treasury Regulation 74 provides:

"Income from long-term contracts is taxable for the period in which income is determined, such determination depending upon the nature and terms of the particular contract. As used herein the term 'long-term contracts' means building, installation, or construction contracts covering a period in excess of one year. Persons whose income is derived in whole or in part from such contracts may, as to such income, prepare their returns on the following bases:

"(a) Gross income derived from such contracts may be reported on the basis of percentage of completion * * *.

"(b) Gross income may be reported in the taxable year in which the contract is finally completed and accepted, if the taxpayer elects as a consistent practice so to treat such income, provided such method clearly reflects the net income."

The right of a taxpayer to report income from "long-term contracts" on the basis of either of the two options provided in the foregoing regulations is permissible only. He may, as to such income, "prepare his returns" upon either of the bases authorized. It is clear the plaintiff did not avail itself of the option to prepare its returns on the basis of percentage of completion of its contracts.

Assuming that the contracts in this case are long-term contracts, within the meaning of the regulations, the plaintiff's right, under the second option provided in the regulations, to report its income in the taxable year in which such contracts are finally completed is predicated on two conditions: (1) That the plaintiff elected as a consistent practice to so treat such income; and (2) that such method clearly reflected the net income.

■ Did the plaintiff in this case elect, as a consistent practice, to treat the income de-

rived from its several contracts on the "completed contract" basis?

We are of the opinion that it did not. Its books of account were not kept on the "completed contract" basis, showing the receipts and expenditures and net profits as to each of its contracts separately. The "completed vessel" is the unit used by plaintiff on its books and accounts in accruing the receipts and expenditures and determining its profits in connection with the construction of all hulls and the installation of machinery under all of its contracts. This fact, together with the further fact that the plaintiff in its original tax return for the year 1918, the year in which it first reported income from any of its contracts, treated the "completed vessel," not the "completed contract," as the basis for determination of its income, clearly shows that the plaintiff did not elect as a consistent practice to treat the income from its several government contracts on the "completed contract" basis, to be reported, as income, in the taxable year in which such contracts were finally completed. It is significant also, as showing how the plaintiff elected to have its income treated, to note that in its 1918 return it reported income derived from five out of the seven contracts, only one of which, contract No. 7 W. H., was fully completed within the year, thus reporting income for the year from four contracts, none of which were completed.

At no time, either in the method of keeping its books and records or in its original or amended tax returns reporting income from these contracts prior to the filing of its amended returns on November 3, 1924, for the years 1918, 1919, or 1920, did the plaintiff indicate its election to have the income from such contracts treated on the "completed contract" basis.

■ The plaintiff cannot, in our opinion, by virtue of amended returns, filed six and five years, respectively, after its original tax returns for 1918 and 1919 were made, make the election provided in the regulation of treating as a consistent practice such income on the "completed contract" basis, and reporting income therefrom in the taxable year in which such contracts are finally completed. The plaintiff cannot in the year 1924 make its election as to how income accruing to it during the years 1918 and 1919 shall be treated.

■ The second condition to the plaintiff's right to report the income from its contracts in the taxable year in which such contracts are finally completed is that such method clearly reflects the net income.

It is conceded the net receipts accruing to the plaintiff, during the taxable years 1918 and 1919, in connection with its several government contracts, amount to the sum of $2,509,441.09.

The receipt of this large income by the plaintiff during the years in question is not denied. It is also shown that a part of this income was, during each of the years in question, distributed in the form of dividends by the plaintiff to its shareholders. The whole of this income is held in suspense by the plaintiff on its amended returns of November 3, 1924, with the result that it is made to appear from the said returns that, instead of making a profit during the years 1918 and 1919, it actually incurred a loss therefrom.

■ In view of the fact that the plaintiff's books of account clearly establish the accrual of this income to the plaintiff during the years 1918 and 1919, and the usually accepted rule that the income tax is an annual tax, and that income must be reported for tax purposes in the year in which it is determinable, and that such income shall be computed in accordance with the method of accounting regularly employed by the taxpayer in keeping its books, where such method clearly reflects income, we are of the opinion, the plaintiff is not entitled to have its tax liability for the years 1918 and 1919 computed on the basis of its amended returns filed November 3, 1924. The plaintiff neither elected, as a consistent practice, to treat the income from its several government contracts on the "completed contract" basis, nor does such method clearly reflect its income for the years in question.

The plaintiff urges that, even if income derived from the uncanceled contracts is held to be properly reported on the basis of "completed vessels" in the years in which such vessels are completed, delivered, and accepted, the plaintiff nevertheless is entitled to hold in suspense the net receipts derived for the year 1919, from the four hulls, completed, delivered, and accepted, under contract No. 468 W. H., which contract was canceled as to four other hulls, until the amount due the plaintiff on account of such cancellation has been determined in this suit.

■ It is shown by the plaintiff's books and records, the correctness of which is not questioned, that it derived a net profit of $563,013.49 out of the four hulls constructed by it under this contract. We think this profit is

taxable income to the plaintiff for the year 1919. The fact that the contract under which these four hulls were constructed was canceled as to certain other hulls which were not constructed does not in any way affect the plaintiff's profit derived from the four hulls which were actually constructed, delivered, and accepted under the said contract. Under the provisions of the canceled contract, the plaintiff was not entitled to any profit as to those hulls, the construction of which was canceled. It was entitled only to just compensation for loss incurred by it because of such cancellation.

Whatever compensation it might receive on account of the cancellation of certain hulls covered in the contract would neither increase nor decrease its certain and determined profits in connection with the four hulls that were constructed and accepted.

The Commissioner of Internal Revenue properly included the profits derived by the plaintiff from the construction of these four hulls in its income for the year 1919.

■ Also his action in including in income for the year 1919 the amount awarded by the government to the plaintiff during the year on account of the two canceled contracts was correct. Article 51 of Treasury Regulations No. 62 provides that "such items as claims for compensation under canceled Government contracts constitute income for the year in which they are allowed, or their value is otherwise definitely determined." The amounts awarded to the plaintiff and received by it during the year 1919, on account of its claim growing out of the cancellation of the two canceled contracts, was income for that year. Whatever additional amount, if any, may be awarded the plaintiff on its cancellation claim, will be income, to the plaintiff, in the year in which it is allowed or determined.

Even if the plaintiff is correct in its position that it is entitled to report the income from its several government contracts on the "complete contract" method, it would be required to report the income for each separate contract in the year in which that particular contract is finally completed. It would not be permitted to withhold the reporting of income from a contract, finally completed, until other contracts upon which it is working are also completed.

■ Where the completed contract method is adopted for reporting income on long-term contracts, such income is properly reported when the work under the contract has been completed and accepted. That is the date for the determination of the profit involved in the contract. Thomas Cronin v. Lewellyn (D. C.) 9 F.(2d) 974.

■ A long-term contract is completed when the work has been performed on the one hand, and payment of the contract price made on the other. Mesta Machine Co. v. Commissioner, 12 B. T. A. 523.

In the instant case, contract No. 7 W. H., providing for the construction of four hulls was finally completed during the taxable year 1918. These four hulls were all completed by the plaintiff and were received, and accepted, by the defendant within the year. Under the completed contract method of reporting income, the plaintiff would be required to report the income from this contract for the year 1918.

Likewise, the thirteen wooden hulls covered in contracts Nos. 148 W. H., 148 W. H. supplement A, and 148 W. H. supplement B, were all completed, delivered, and accepted, and the plaintiff received the contract price for each of said hulls within and before the close of the taxable year 1919. Also machinery installation contract No. 1 was finally completed during the year 1919.

Under the completed contract method of reporting income, the plaintiff would be required to report the income from these four completed contracts on its 1919 tax return.

Plaintiff in its amended returns for the years 1918 and 1919 does not report the income from these completed contracts for the years in which they were finally completed. Consequently the plaintiff has not, either in its original tax returns, or in its amended returns for the years in question, reported its income under the completed contract method.

The plaintiff's contention that, under the completed contract method of reporting income, a contract is not finally completed until all claims and counterclaims growing out of such contract have been definitely settled, cannot be sustained.

■ Profits accruing from a completed contract may not be held in suspense pending the ascertainment and adjustment of claims and contingent liabilities growing out of such contract.

■ If expenses be incurred by a taxpayer later on account of such liabilities, such expenditures are properly deducted from income in the year in which they are paid. Harrison v. Heiner (D. C.) 28 F.(2d) 985; Cronin v. Lewellyn, supra.

However, in view of our decision that the plaintiff did not elect, as a consistent prac-

tice, to treat the income from its various contracts on the completed contract basis, and did not use that method originally in reporting such income for the years in question, and that such method does not clearly reflect its income, further discussion of what would be a correct accounting of the plaintiff's income under that method is not necessary.

During the year 1919, the plaintiff constructed for its own use and for the purpose of sale four barkentines at a cost of $731,-199.68. In the latter part of the year 1920, the plaintiff sold these four barkentines to a corporation, whose stockholders were identical with the stockholders of the plaintiff, for a consideration of $300,000 resulting in a loss of $431,199.68.

In its closing inventory for the year 1919, the plaintiff carried these barkentines at $731,199.68, the cost thereof, and also carried them on its opening inventory for the year 1920 at the same figure.

In its original tax return for the year 1919, the plaintiff did not claim a deduction for its barkentine loss for that year, but did claim such deduction for the year 1920 on its original tax return for that year.

In its amended returns for the years 1918, 1919, and 1920, filed November 3, 1924, the plaintiff deducted its barkentine loss of $431,-199.68 from income for the year 1919. The Commissioner of Internal Revenue allowed the deduction for the year 1920 in conformity with the plaintiff's original return.

It is not shown that the market price of the four barkentines on December 31, 1919, was any less or different from the cost price of the same. The fact that the barkentines were sold at a loss, nearly a year after they were inventoried by the plaintiff at cost does not establish the fact that such sale price was the market value of such barkentines at the date of the inventory. Conceding that plaintiff was entitled to inventory the four barkentines on December 31, 1919, on the basis of "cost or market, whichever is lower," it is incumbent on the plaintiff to establish, by competent proof, the market value of the barkentines as of that date, if they are to be inventoried at market price. This the plaintiff has failed to do. The action of the Commissioner in deducting the loss incurred by the plaintiff on account of the barkentines for the year 1920, the year in which they were sold, and in which both the plaintiff's books and its original tax return shows the loss was incurred, is correct.

If, however, the amended returns filed November 3, 1924, are correct, the plaintiff is not entitled to recover the taxes paid for the years 1918 and 1919, unless within the time prescribed by law it filed a proper and sufficient claim for the refund of such taxes.

The claim for refund filed December 15, 1923, set out the basis of the plaintiff's claim as follows:

"This corporation has paid the Government income taxes for the years 1917 to 1920, inclusive, to the amount of $316,341.57. The corporation has applied for, and has been granted, consideration of its assessments for these years under the special assessment provisions of the statute, but no determination of its assessment under that statute has yet been made by the department.

"It is our belief, and we so claim, that the total taxes of this corporation for the years 1917 to 1922, inclusive, when finally determined under the special assessment provisions of the statute will not exceed $200,-000, leaving an overpayment of $116,341.-57."

This claim is attacked by the defendant as insufficient, in that such claim does not set out the same ground for a refund that is relied upon by the plaintiff for recovery in this suit.

The applicable Treasury Regulations (article 1036 of Regulations No. 62) provide in part as follows:

"*Claims for Refund of Taxes Erroneously Collected.*—Claims by the taxpayer for the refunding of taxes and penalties erroneously or illegally collected shall be made on Form 843. In this case the burden of proof rests upon the claimant. All the facts relied upon in support of the claim should be clearly set forth under oath. * * * "

Section 3226 of the Revised Statutes, as amended by the Revenue Act of 1921 (26 US CA § 156), provides:

"No suit or proceeding shall be maintained in any court for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected until a claim for refund or credit has been duly filed with the Commissioner of Internal Revenue, according to the provisions of law in that regard, and the regulations of the Secretary of the Treasury established in pursuance thereof. * * * "

The rule is well established by decisions of this and other courts that compliance with the statutory requirements with reference to

the filing of claims for refund is a condition precedent to the right of a taxpayer to maintain a suit for the recovery of taxes claimed to have been illegally or erroneously collected. Feather River Lumber Co. v. United States, 66 Ct. Cl. 54; Hazel M. Davis v. United States, 67 Ct. Cl. 643; Swift & Co. v. United States, 68 Ct. Cl. 97.

In Feather River Lumber Co., supra, the court said:

"While it has been held that the form of the claim for refund is not essential, there has been no deviation from the well-established rule that the aggrieved taxpayer must assert his right to a refund by an application to the commissioner containing the grounds upon which he relies for such recovery before he will be permitted to bring an action for same."

The Circuit Court of Appeals for the Eighth Circuit in Red Wing Malting Co. v. Willcuts, 15 F.(2d) 626, 634, 49 A. L. R. 459, held:

"The precise ground upon which the refund is demanded must be stated in the application to the Commissioner, and we think, if that is not done, a party cannot base a recovery in the court upon an entirely different and distinct ground from that presented to the Commissioner."

In J. H. Williams & Co. v. United States, 46 F.(2d) 155, decided March 25, 1930, by the United States District Court for the Eastern District of New York, the court said:

"The law is well settled that the purpose of a refund claim is to inform the Commissioner of the nature of a taxpayer's complaint and to give the Commissioner an opportunity to act upon the complaint on the merits, and to correct any errors, mistakes or omissions made by his department before the taxpayer is allowed to bring an action based upon such errors, mistakes or omissions. The precise ground upon which the refund is demanded must be stated in the application to the Commissioner. It is a required precedent or limitation that the action shall be upon the same grounds and only such as are presented in the claim."

Under the rule announced in the cases cited, the refund claim filed by the plaintiff in this case is clearly insufficient to support an action for the recovery of the taxes paid by it for the years 1918 and 1919. The refund claim filed by the plaintiff did not request a refund of taxes on the ground that its income should have been reported on the completed contract basis, upon which basis it had no tax liability for either of the years in question. On the other hand, the claim expressly recognizes that the plaintiff did derive taxable income for the said years from its contracts. The claim for refund is based wholly upon the ground that the plaintiff had applied for and had been granted consideration of its assessments for the years in question under the special assessment provisions of the statute, in which case, it was asserted in the claim, the plaintiff's total tax liabilities for the said years would not exceed $200,000, leaving an overpayment of $116,341.57.

This is an entirely different claim from that relied upon by the plaintiff in this suit. In its refund claim, the plaintiff sought a return of taxes imposed upon income for the years 1918 and 1919, which it did not then claim was wrongfully reported for the said years, but the tax upon which it claimed was in excess of the amount it would be required to pay under the special assessment provisions of the statute. The claim did not protect plaintiff's right to sue on any other ground.

The plaintiff is now seeking a recovery of all the taxes paid by it for the years in question on the ground that income from its government contracts was improperly reported and that it had no tax liability whatever for the said years. The refund claim does not mention the loss incurred by the plaintiff on the barkentines, and no claim is made that this loss should be deducted for the year 1919, which claim the plaintiff urges in this suit.

It is clear that the ground relied upon by the plaintiff in this suit for the recovery of taxes paid for the years 1918 and 1919 is entirely different and distinct from the ground stated in the claim for refund presented to the Commissioner of Internal Revenue. The plaintiff, therefore, cannot maintain its action in this court for the recovery of the said taxes.

The final computation of the plaintiff's tax liability for the years 1918 and 1919 shows the tax due from the plaintiff for 1918 was $360,041.83, instead of $100,218.91, as reported by it, and the amount due for the year 1919 was $584,099.67, instead of $317,999.29, as originally reported by plaintiff.

In June, 1922, the Commissioner made a deficiency assessment against the plaintiff for the year 1918 of $109,578.19, leaving a balance of the deficiency in tax for that year as determined by him of $90,224.73 unassessed.

In June, 1922, the Commissioner made an additional assessment against the plaintiff for the year 1919 for the amount of the deficiency found due for the said year.

In making the computation of the plaintiff's tax liability for the years 1918 and 1919, the Commissioner of Internal Revenue did not change or alter the method of reporting income adopted by the plaintiff in its original returns for the said years, only changing such returns so as to make them conform to the facts as to the years in which various vessels were completed, delivered, and accepted, which changes have already been discussed.

There is no controversy between the parties as to the figures used. They are all taken from the plaintiff's books and records, and are accepted by both the plaintiff and defendant as correct.

Holding, as we do, that the action of the Commissioner of Internal Revenue was correct in computing the plaintiff's tax liability for the years in question on the basis of accrued receipts and expenditures as to each vessel when completed, accepted, and delivered, as such receipts and expenditures are shown by its books and records, and that the barkentine loss is deductible for the year 1920, the defendant is entitled to recover on its counterclaim (No. 6) for unpaid taxes and penalties for the years 1918 and 1919 the sum of $537,440.37, the difference between the amount of taxes assessed against it for the said years and the amounts paid thereon, together with such interest and penalties on the said unpaid taxes as may be provided by law.

There is due the plaintiff on the first and second causes of action alleged in its petition the sum of $247,732.48 as just compensation for loss resulting to it from the cancellation by the defendant of contracts Nos. 468 W. H. and 35 M. I. There is due the plaintiff under its third cause of action the sum of $36,066.71 for miscellaneous services rendered the defendant in connection with the several contracts, making a total sum due the plaintiff of $283,799.19.

There is due the defendant on its counterclaim No. 4 (the Magee lumber contract) the sum of $19,763.22; and on its counterclaim No. 6 for unpaid taxes for the years 1918 and 1919 there is due the defendant the sum of $537,440.37, or a total of $557,203.59.

The defendant is therefore entitled to judgment against the plaintiff for the sum of $273,404.40. Judgment is therefore awarded in favor of the United States against

the plaintiff for the said amount. It is so ordered.

WHALEY, Judge, did not hear this case, and took no part in its decision.