ROCKWELL INTERNATIONAL CORPORATION, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3121–77.     Filed October 13, 1981.

*Richard A. Mullens* and *Robert E. Liles II*, for the petitioner.
*Russell F. Kurdys*, for the respondent.

DAWSON, *Judge*: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ended September 30, 1969, in the amount of $8,580,000. The basic question presented for decision is whether petitioner's predecessor in interest, North American Rockwell Corp., improperly claimed a lower of cost or market inventory writedown during the year in issue in the amount of $16,250,000 with respect to

costs accumulated under a partially completed defense subcontract.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation and the attached exhibits are incorporated herein by reference.

#### *Corporate and Business Background*

Rockwell International Corp. (Rockwell) is a corporation organized and existing under the laws of the State of Delaware. Its principal office is located in Pittsburgh, Pa.

On September 22, 1967, Rockwell-Standard Corp., a Delaware corporation, merged into North American Aviation, Inc. (North American), a Delaware corporation and a predecessor in interest to Rockwell, and on that same date the latter corporation changed its name to North American Rockwell Corp. (also, for purposes of clarity, referred to as Rockwell). On February 16, 1973, Rockwell Manufacturing Co., a Pennsylvania corporation, merged into North American Rockwell Corp., and the latter corporation changed its name to Rockwell International Corp. During the fiscal year ended September 30, 1969, Rockwell and its consolidated subsidiaries were engaged in the manufacture of military and civilian aircraft, spacecraft, rocket engines, military and civilian electronics components and equipment, automotive and truck components, commercial printing presses, power boats, and textile machinery. Rockwell and its consolidated subsidiaries still engage in the majority of these lines of business.

Rockwell timely filed its Federal corporate income tax return for its fiscal year ended September 30, 1969, with the District Director of Internal Revenue, Los Angeles, Calif., under the name North American Rockwell Corp. and Domestic Subsidiary Cos.

#### *Purchase Order No. 181*

The subcontract relevant to the issue in this case covered the research, development, and production of military elec-

---

[1]All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, unless otherwise indicated.

tronics components and equipment for the F–111 aircraft. The subcontract was designated "Purchase Order No. 181" (P.O. 181) and was executed on June 27, 1966, by North American, as subcontractor, and by General Dynamics Corp. (General Dynamics), the prime contractor, with the U.S. Air Force responsible for the development and manufacture of the F–111 aircraft. North American assigned responsibility for P.O. 181 to its Autonetics Division (Autonetics). The specific subject matter of P.O. 181 was specialized attack radars, navigation devices, cockpit instrument panels, and computers, referred to as "avionics." These components and equipment were named the "Mark II" and "Mark II-B" avionics systems, and are collectively referred to herein as "Mark II."

There were 16 major end items (i.e., finished products) to be manufactured under P.O. 181:

*FB–111A (Strategic bomber)*
1. Inertial navigational system (INS)
2. General purpose computer (GPC)
3. Electronic equipment rack (RK)
4. Converter (CV)
5. Central control unit (CCU)
6. Numeric display unit (NDU)

*F–111D (Tactical fighter-bomber)*
7. Stores management set (SMS)
8. Attack radar set (ARS)
9. Integrated display set (IDS)
10. Radar (RAD)
11. Electronic equipment rack (RK)
12. Panels (various)
13. General purpose computer (GPC)
14. Inertial navigational system (INS)
15. Doppler radar (DR)
16. Horizontal situation display (HSD)

P.O. 181 was a fixed-price incentive-type contract. Such contracts generally specify a target cost, target price, and ceiling price, and also provide for cost or performance incentives in the form of upward or downward adjustments to the target profit (i.e., target price less target cost) based on a sharing ratio. The incentive clause of P.O. 181 operated in the following manner. In the event Rockwell's actual cost equaled target cost, it would be entitled to receive the target price (i.e.,

cost plus target profit). If actual cost turned out to be less than target cost, Rockwell would receive an amount equal to the target price reduced by 80 percent of the cost underrun. On the other hand, if actual cost exceeded target cost, the price would be determined by adding actual cost plus target profit less 20 percent of the cost overrun. Under no circumstances, however, would Rockwell be entitled to receive more than the contract ceiling price.[2]

The price incentive provision of P.O. 181 contemplated only a single target cost, target price, and ceiling price. As additional tasks were added to the basic contract (i.e., extra work outside the scope of the performance originally contracted for), these three amounts were increased to take into account the newly negotiated figures pertaining to the additional tasks. Thus, in the event Rockwell was able to complete a particular task at, or below, target, the unused ceiling price negotiated for that task would be available to offset cost overruns on some other part of the contract.

Under paragraph 18 of the schedule to P.O. 181 (relating to prices to be paid to Rockwell) it was agreed that a target cost, target price, and ceiling price for the Mark II project had not been established as of the date of the purchase order. It was further agreed that Rockwell would promptly enter into negotiations with General Dynamics to establish such amounts for the research, development, and initial production phases, and that these amounts would, in no event, exceed the following:

Target cost .......................... $132,132,000
Target price ......................... 145,345,000
Ceiling price ........................ 171,771,000

The ceiling price, which establishes the maximum amount payable to the contractor regardless of its costs under the contract, was computed at 130 percent of the target cost. Under the contract, the Air Force was given the right of final approval on all target and ceiling figures negotiated between Rockwell and General Dynamics.

_____

[2] The 80/20 sharing ratio was established by the terms of Change Order 24, which was formally executed on May 7, 1970.

P.O. 181 also provided that Rockwell was entitled to receive progress payments throughout the term of the contract.[3] Such payments were available to Rockwell in an amount equal to: (1) 70 percent of its incurred costs (exclusive of subcontractors' costs), plus (2) the amount of progress payments received by certain subcontractors, less (3) the sum of all previous progress payments. The progress payments were to be repaid or "liquidated" through the offset of a percentage (65.3 percent) of the invoice amounts due to Rockwell upon delivery of items under the contract. If at any time during the contract a progress payment or the total unliquidated progress payments exceeded either 70 percent of the costs incurred or 70 percent of the contract price, P.O. 181 provided that Rockwell was obligated to repay the excess upon demand. Rockwell was also obligated to repay, on demand, the amount of any unliquidated progress payments upon termination of the contract for default.

Pursuant to the progress-payments provision of P.O. 181 (contained in par. B.21 of sec. B, Special Provisions, of Basic Agreement No. MS–A–66), title to all material, inventories, work in process, etc., acquired or produced by Rockwell and allocable or properly chargeable to the contract, vested in the Government upon execution of the contract. Specifically, subparagraph (d) of paragraph B.21 (as amended by sec. C, par. 9 of exhibit I of Basic Agreement No. MS–A–66) provided as follows:

d. *Title.* Immediately on the date of this purchase order, title to all parts, materials, inventories, work in process, special tooling as defined in the clause of this purchase order entitled Special Tooling, Special Test Equipment, and other Special Tooling to which the Government is to acquire title pursuant to any other provision of this purchase order; non-durable (i.e., non-capital) tools, jigs, dies, fixtures, molds, patterns, taps, gauges, test equipment and other similar manufacturing aids title to which is not obtained as Special Tooling pursuant to this paragraph; and drawings and technical data (to the extent delivery thereof to Buyer and/or the Government is required by other provisions of this purchase order) theretofor acquired or produced by the Seller and allocated or properly chargeable to this purchase order under sound and generally accepted accounting principles and practices shall forthwith vest in the Government; and title to all

---

[3]These payments were made from time to time upon the approval by General Dynamics of progress-payment invoices submitted by Rockwell.

like property thereafter acquired or produced by the Seller and allocated or properly chargeable to this purchase order as part of aforesaid shall forthwith vest in the Government upon said acquisition, production or allocation. Notwithstanding that title to property is in the Government through the operation of this clause, the handling and disposition of such property shall be determined by the applicable provisions of this purchase order such as the Default clause and paragraph h of this clause and the Termination clause and the Special Tooling clause, if any. Current production scrap may be sold by the Seller without approval of Buyer and the proceeds shall be credited against the costs of purchase order performance. With the consent of Buyer and on terms approved by Buyer, the Seller may acquire or dispose of property to which title is vested in the Government pursuant to this clause, and in that event, the costs allocable to the property so transferred from this purchase order shall be eliminated from the cost of purchase order performance and the Seller shall repay to Buyer (by cash or credit memorandum) an amount equal to the unliquidated progress payments allocable to the property so transferred. Upon completion of performance of all the obligations of the Seller under this purchase order, including liquidation of all progress payments hereunder, title to all property (or the proceeds thereof) which had not been delivered to and accepted by Buyer and/or the Government under this purchase order or which had not been incorporated in supplies delivered to and accepted by the Government under this purchase order and to which title had vested in the Government under this Clause shall vest in the Seller. The provisions of this purchase order referring to or defining liability for Government-furnished property shall not apply to property to which the Government shall have acquired title solely by virtue of the provisions of this clause.

Pursuant to subparagraph (e) of paragraph B.21, Rockwell bore the risk of loss with respect to the aforementioned work in process or finished goods prior to delivery to General Dynamics or the Government, as follows:

e. *Risk of Loss.* Except to the extent that the Government or the Buyer shall have otherwise expressly assumed the risk of loss of property, title to which vests in the Government pursuant to this clause, in the event of the loss, theft or destruction of or damage to any such property before its delivery to Buyer or the Government, the Seller shall bear the risk of loss and shall repay the Buyer an amount equal to the unliquidated progress payments based on costs allocable to such lost, stolen, destroyed or damaged property.

The default clause of P.O. 181 provided that if Rockwell failed to deliver the items called for under the contract, the Government could terminate the contract and require Rockwell to transfer to it all supplies, material, and equipment allocable to P.O. 181.

Pursuant to the contract, all patentable inventions created

or generated by Rockwell in the performance of work on the Mark II project were required to be licensed, irrevocably and royalty-free, to the Government for governmental purposes. In addition, all copyrightable technical writings, or data similarly created or generated automatically, became the property of the Government. This requirement was embodied in part in the Armed Services Procurement Regulations as incorporated by references in P.O. 181. Rockwell ultimately obtained 13 patents from the work performed under P.O. 181. To date, Rockwell has received no commercial benefit from the use of an invention developed under P.O. 181. The contract provided that if Rockwell obtained a commercial benefit from the use of an invention developed under the contract (whether through license or sale of a patent or direct use by Rockwell of the invention), Rockwell was required to negotiate an equitable payment with the Government for the proration of nonrecurring program costs, learning benefits from military reproduction, and research and development costs applicable to P.O. 181.

## Accounting Procedures

Since 1930, Rockwell and its predecessors had elected to value their inventories at cost or market, whichever was lower, and the election remained in effect during the years relevant to the issue in this case. During these same years, Rockwell reported its income on the basis of a fiscal year ended September 30 and used an accrual method of accounting based upon deliveries for fixed price and fixed-price incentive contracts. Rockwell followed these methods and used this fiscal year for both financial and Federal income tax purposes.

In its Government contract operations, Rockwell uses the job-order cost accounting system to collect or inventory the actual costs of the work performed. Under the job-order cost accounting system, costs entered into inventory are characterized by both cost element (labor, material, purchased services, or applied overhead) and by some meaningful segregation by components within the contract, such as the individual, major end items.

The cost-collection or inventory system used by Rockwell for P.O. 181 was not different from that used for its other Government contracts and was consistent with the accounting

practices of other Government contractors in the aerospace industry. Costs entered into the system were identified as labor, material, or overhead (and as specific subcomponents of those categories) and were also identified with general order and release numbers. General order numbers were established for each major end item. Some end items had more than one general order number to distinguish the type of effort involved with respect to the item (such as design, fabrication of prototypes, or special tooling). Release numbers were used to identify production sub-groups or production lots of an end item. The determination of the number of individual items within a given release number or production lot was based on the most economical lot size to place into production at a given time.

Rockwell records sales under its fixed-price contracts as products are delivered or services performed. Cost of sales is recorded at the same time, with offsetting amounts normally credited to the appropriate work-in-process inventory account. The amount recorded as cost of sales is determined with reference to the job-order cost accounting system and the general order and release numbers established thereunder. Upon delivery of a given end item, Rockwell determined which costs were directly related to that end item. Other related direct costs which could not be specifically identified (such as design and development, tooling, and logistics effort) were allocated by making an estimate at completion of the total cost of the particular effort involved, dividing this figure by the total number of end items to be delivered under the contract, and adding the result to the cost of the end item in question. Both the direct costs and related direct costs not specifically identified with a given end item contained their applicable share of manufacturing, engineering, and general administrative overhead costs.

The amount to be recorded as sales upon delivery or performance depended on the type of contract involved. For fixed-price incentive contracts expected to be completed at a profit, the amount included in sales represented the sum of (a) the amount recorded as cost of sales, (b) the basic earned profit (i.e., the effective contract profit rate times the recorded cost of sales), and (c) performance incentives earned during the period, if any. The effective contract profit rate represented

the percentage relationship between the estimated profit to be realized on the contract and the estimated cost of sales at completion.

In the event Rockwell projected an overall loss on a contract at the end of a particular taxable year, it would take the entire loss into income for that year by reducing the value of its work-in-process ending inventory by such amount through the vehicle of a lower of cost or market inventory adjustment. Thus, the costs remaining in ending inventory at the end of any given year under P.O. 181 consisted of the total costs incurred by Rockwell to that date, less cost of sales to date and inventory writedowns, if any.

The cash progress payments which Rockwell received from General Dynamics under the terms of P.O. 181 did not determine Rockwell's cost of sales, sales, or net income for financial or tax purposes.[4]

### Negotiations Over Design Changes and Ceiling Price for P.O. 181

Soon after P.O. 181 was executed, the Air Force, General Dynamics, and Rockwell caused substantial changes to be made to the work to be performed by Rockwell under the contract. A number of changes which took place within a year after the execution of P.O. 181 were subsequently embodied in a document known as "Change Order 24" (C.O. 24). By 1976, a total of 442 change orders had been issued under P.O. 181. Of these, 67 were issued as of September 30, 1969. These change orders established or modified various technical specifications for the avionics systems contemplated by P.O. 181 as originally executed on June 27, 1966. However, some of these 67 change order specifications were not incorporated in the new target cost, target price, and ceiling price figures established by C.O. 24. The target cost, target price, and ceiling price for these change orders, as well as for the 375 additional change orders, were to be negotiated after September 30, 1969, by Rockwell, General Dynamics, and the Air Force. For the sake of clarity, the work encompassed by C.O. 24, i.e., the research, develop-

---

[4]Presumably, the progress payments were recorded by debiting cash and crediting a liability account, such as "Unliquidated Progress Payments," which account was later debited when sales were recorded.

ment, and initial production work, will be referred to as "C.O. 24 work," and the work to be performed under all change orders not embodied in the target cost and price and ceiling price of C.O. 24, will be referred to as "additional P.O. 181 work."

Soon after the execution of P.O. 181, it became apparent to all parties concerned that the not-to-exceed amounts (target cost of $132,132,000, target price of $145,345,000, and ceiling price of $171,771,000) specified in P.O. 181 were entirely unrealistic because of the extensive engineering changes made by the Air Force, General Dynamics, and Rockwell, and because the available technology at the time the contract was executed was inadequate to meet the specifications in P.O. 181 and subsequent changes thereto. As a result, the parties were unable to reach a prompt conclusion to their negotiations over the target and ceiling figures for P.O. 181.

In March 1967, Rockwell determined that the cost of the C.O. 24 work at completion would be $304 million and submitted that figure, along with a target price of $356,700,000, to General Dynamics and the Air Force. Rockwell's submission did not identify its requirements for a ceiling price. These figures were deemed unacceptable by the Air Force, which felt that Rockwell had not adequately supported the additional costs attributable to the changed specifications.

In April 1967, Rockwell, with the approval of General Dynamics, proposed to the Air Force new not-to-exceed amounts for the C.O. 24 work, as follows:

Target cost ...........................$270,000,000
Target price ......................... 297,000,000
Ceiling price ........................ 337,500,000

This proposal was again rejected by the Air Force. It intended to hold General Dynamics (and therefore Rockwell) responsible for producing and paying for all original work and specifications, and would only increase the ceiling price beyond the original not-to-exceed amount ($171,771,000) to reflect "out-of-scope" costs attributable to specification changes. Accordingly, the Air Force refused to accept the April 1967 proposal without adequate proof that the increases in the not-to-exceed amounts were attributable solely to out-of-scope work. It was willing, however, to acknowledge the existence of

an additional $18,400,000 in target costs which it conceded were due to out-of-scope work, thereby increasing the ceiling price for the C.O. 24 work to $195,691,600 ($150,532,000 × 130 percent).

In October 1968, Rockwell submitted a 3,000-page cost traceability report[5] to the Air Force which purported to justify a total cost for the C.O. 24 work of approximately $375 million including subcontractor claims and the cost of implementing 4,425 specification changes.[6] By July 1969, Rockwell had increased its estimate of the total costs for the C.O. 24 work to $390,100,000.

The difference in positions between the Air Force and Rockwell and General Dynamics was the basis for lengthy negotiations which occurred in August, September, October, and November 1969 between General Dynamics, Rockwell, and the Air Force. From September 17 through September 19, 1969, a series of meetings between General Dynamics and the Air Force was held. Also, from September 24 through September 27, a series of meetings between General Dynamics, Rockwell, and the Air Force was held. Both series of meetings were to finalize amounts for the work specified in P.O. 181 as modified.

In late September 1969, Fred Eyestone, president of Autonetics, and John J. Roscia, vice president and general counsel of Rockwell, met with Phillip Whittaker, the Assistant Secretary of the Air Force for procurement matters, in Colorado Springs, Colo. At that meeting, Messrs. Roscia and Eyestone were told that the Air Force would go no higher than a target cost of $257 million and a ceiling price of $321,250,000, or 125 percent of target cost.

On October 7, 1969, the Air Force directly informed Rockwell officials that it was prepared to approve a settlement for C.O. 24 at a target cost of $257 million, a target price of $282,700,000, and a ceiling price of $321,250,000. Also, the Air Force indicated that it was considering increasing the prog-

---

[5] This voluminous report identified approximately 2,500,000 impact points of engineering changes which were weighted in terms of complexity and value in order to assess the cost impact of the various changes up to that point.

[6] By October 1969, Rockwell estimated that only 2,156 of the specification changes would have a cost impact on the contract.

ress-payments percentage from 70 percent to 90 percent upon finalization of C.O. 24.

Further meetings were held on October 9 and October 16 between General Dynamics and the Air Force. During these meetings, the pricing of P.O. 181 was discussed but no agreement was reached. Finally, during meetings held on October 31 and November 1, General Dynamics and the Air Force reached final agreement upon the target cost, target price, and ceiling price to be embodied in C.O. 24, as follows:

Target cost ...........................$257,000,000
Target price ......................... 282,700,000
Ceiling price ........................ 321,250,000

The parties also agreed that the progress-payments percentage would be increased from 70 percent to 90 percent of incurred costs,[7] and that delivery penalties previously proposed by the Air Force amounting to approximately $2 million would be dropped from the finalized C.O. 24. These provisions were agreed to verbally and were contingent on receiving final written approval from the Air Force.

On November 1, 1969, Rockwell sent General Dynamics a letter with a memorandum attached indicating acceptance of a $321,250,000 ceiling price for the research, development, and initial production work. General Dynamics indicated its consent to the agreement by countersigning a copy of the letter. On November 9, 1969, an Air Force contracting officer issued the operative document (C.O. 24) embodying the new amounts and revised provisions for P.O. 181, which document was approved by the U.S. Air Force on November 12, 1969, and mailed to General Dynamics on November 13, 1969. By letter dated November 14, 1969, General Dynamics advised Rockwell that the Air Force had accepted the Rockwell-General Dynamics agreement of November 1, 1969. C.O. 24 was formally executed by Rockwell and General Dynamics on May 7, 1970.

---

[7]In addition, it was agreed that the liquidation rate for the progress payments (i.e., repayment percentage to be applied against contract billings) would be increased from 65.3 to 90 percent. Rockwell expected the increase in the progress-payments percentage (from 70 to 90 percent) to decrease its near-term interest expense incurred in financing contract performance by approximately $5 million.

*Estimation of the Anticipated Loss on P.O. 181*

The first deliveries of end items manufactured under P.O. 181 took place during the taxable year ended September 30, 1968. However, Rockwell reported no income on the items delivered in that year because it anticipated at yearend that P.O. 181 would be a break-even contract. Rockwell based its break-even projection on a report dated September 30, 1968, prepared by the Autonetics' Strike Avionics Systems Division (SASD) and referred to as an "Estimate at Completion" (EAC):[8]

| | | |
|---|---:|---:|
| *Target cost* | *(Amounts in millions)* | |
| C.O. 24 work | $270.0 | |
| Additional P.O. 181 work | 197.2 | |
|   Total | 467.2 | |
| *Contract value* | | |
| Ceiling price (125% of 467.2) | 584.1 | |
|   Less: Delivery penalty | (1.8) | |
|   Total | | $582.3 |
| *Estimated cost at completion* · | | |
| Allowable costs | 565.2 | |
| Unallowable research costs | 4.7 | |
|   Total | | 569.9 |
| Remainder | | 12.4 |
|   Less: Provision for negotiation losses | | (2.0) |
|   Estimated amount required for correction of deficiencies | | (10.4) |
| Projected break-even | | 0 |

The accuracy of this projection was a function of two variables: the estimated selling price (the contract value) and the estimated cost at completion. In estimating the selling price, two assumptions were made. First, it was assumed that Rockwell would be successful in negotiating a $270 million target cost and a $337,500,000 ceiling price ($270 million × 125 percent) on C.O. 24. A second assumption factored into the analysis was that Rockwell would be able to negotiate target costs on all additional contract work in amounts which would approximate the actual costs to be incurred in their completion. By so doing, Rockwell hoped to be able to apply the

---

[8]Such reports were periodically prepared by SASD and were updated on a monthly basis to reflect the division's best estimate of the cost impact of the most recent changes in contract specifications and quantities.

unused ceilings on those changes (i.e., ceiling price less actual cost) against the cost overrun on the C.O. 24 work, thereby mitigating the losses attributable to C.O. 24.

The process of estimating the costs at completion was a difficult task made more so by the myriad of contract changes which took place in the initial stages of the contract. The degree of difficulty was mirrored by the 3,000-page cost traceability report which Rockwell submitted to the Air Force in October 1968. A number of steps were involved in determining the cost impact of a particular contract change. First, it was necessary to identify the change and the particular facets of the program upon which it impacted. Then, the particular work items required by the change were identified, such as design and development work, data modifications, or hardware changes requiring additional design, development, and testing in addition to changes in the manufacturing hours and material necessary to produce the article. To further complicate matters, Rockwell had to evaluate the impact of other proposed contract modifications on the particular change in question. For this purpose, it employed an estimating technique, known as an impact matrix, which helped identify incremental costs and the interaction among them. After the cost estimates were prepared, they were reviewed by the SASD Contracts and Pricing Division which would then prepare a sales-price proposal for submission to General Dynamics.

In addition to estimating the basic contract costs associated with design, development, testing, engineering, and production, Rockwell also had to estimate the costs it would incur in discharging its ongoing contractual obligation to correct any deficiencies which might surface after the delivery of finished end items. It was Rockwell's experience that these correction-of-deficiencies (COD) costs generally ran somewhere between 5 and 7 percent of hardware fabrication costs.

On September 10, 1969, the Autonetics Division prepared a financial summary of P.O. 181. An internal memorandum dated September 19, 1969, from Fred Eyestone, president of Autonetics, and D. R. MacBlane, vice president of finance, to C. E. Ryker, Rockwell's controller, stated that the data on which the September 10 analysis was based represented the best financial information available on the contract at that time, and also indicated that the data had not changed

significantly as of September 19. The financial summary projected estimated costs at completion of $762,700,000 (including $3,700,000 for COD already directed by General Dynamics, but not including estimated costs associated with future COD). After deducting estimated delivery penalties of $1,800,000 and a provision for unallowable research costs of $4,700,000, the overall contract ceiling price was projected to be $832,100,000. Subtracting $762,700,000 estimated cost from this figure yielded a remainder or potential profit of $69,400,000.

Accompanying the financial summary was a document which analyzed the potential risks to the remainder on a best-case/ worst-case basis. Four different risks were identified:

(1) COD costs.—This represented the amount required for future correction-of-deficiencies claims to be submitted by General Dynamics. Rockwell's estimates ranged from $14 million to $24 million.

(2) Change Order 53.—This change order altered the delivery schedule for the equipment manufactured under P.O. 181, and consequently increased Rockwell's production costs. Rockwell hoped to negotiate a $25 million target cost and $31 million ceiling price on this change, but, in the worst-case situation, it expected to get nothing.

(3) ARS/IDS claim.—This claim arose because of a fundamental change in the attack radar set brought about by technological impossibility. Because of the impossibility of performance, Rockwell maintained that this was an out-of-scope change for which it was entitled to additional compensation. General Dynamics contended that this should be treated as a correction-of-deficiencies item.[9] In estimating the potential risk to remainder, Rockwell projected a best-case negotiation of a $38 million target cost and a $48 million ceiling price, and in the worst case, nothing.

(4) Ceiling rates on additional P.O. 181 work.—Rockwell anticipated potential losses of up to $10 million in the event General Dynamics insisted on lower ceiling rates in future negotiations.

Taking into account these four factors, the risk analysis

---

[9]This claim was eventually settled in 1971 for $75 million, although it actually cost Rockwell $110 million.

projected the following outcomes on P.O. 181, ranging from the most pessimistic, to the most optimistic, evaluation (amounts in millions):

|  | Worst case | Conservative | Most probable | Best case |
|---|---|---|---|---|
| Remainder before risks | $69.4 | $69.4 | $69.4 | $69.4 |
| COD costs | (24.0) | (24.0) | (19.0) | (14.0) |
| C.O. 53 | (31.0) | (18.0) | (16.0) | 0 |
| ARS/IDS claim | (48.0) | (28.0) | (17.0) | 0 |
| Contract ceiling rates | (10.0) | (10.0) | (5.0) | 0 |
| Net profit (loss) | (43.6) | (10.6) | 12.4 | 55.4 |

Rockwell based its estimate of the remainder before risks on the assumption that it would be successful in negotiating a $337,500,000 ceiling price on C.O. 24, and, therefore, did not include the possibility of receiving a $321,250,000 ceiling as a potential risk to the remainder.

Rockwell prepared another report on the financial status of P.O. 181 as of October 11, 1969. This analysis took into account the most recent EAC as well as potential losses in negotiating C.O. 24, the ARS/IDS claim, C.O. 53, and ceilings on additional P.O. 181 work. However, until late October, management adhered to the belief that the company would be successful in negotiating a $337,500,000 ceiling.[10] The October 11 summary contained the information shown on page 797.

A revised financial summary was prepared by the Autonetics Division on November 4, 1969, and submitted to C. E. Ryker. The attached cover letter discussed the estimation of the contract loss recorded for the fiscal year ended September 30, 1969, as follows:

The only substantial difference in the overall financial assessment on subject program since the last assessment, which was made as of September 19, 1969, is the agreement on Change Order 24 reached in November 1969. At the time of the previous assessment, we anticipated that Change Order 24 would be settled for a target cost of $270 M (ceiling price of $337.5M). The recent agreement specifies a target cost of $257 M (ceiling price of $321.25 M). The difference in ceiling prices will be recorded as a loss in CFY 1969.

Except for the development on Change Order 24, our overall financial assessment on the program indicates an approximate break-even position, after the recording of the loss referred to above. In making this assessment, we have tried to take into account all pertinent factors, and have made what

---

[10]Rockwell also had not given up the possibility of litigating its claim to a $337,500,000 ceiling through use of the disputes process provided in the contract.

## I. CONTRACT NEGOTIATION STATUS

| | Basic contract (CO 24) | ARS/IDS claim | Schedule change (CO 53) | Added work, etc. | Total contract | MEMO Total excluding CO 24 |
|---|---|---|---|---|---|---|
| *Best case negotiation* | | | | | | |
| Target cost | $270.0 | $34.2 | $25.0 | $320.7 | $649.9 | $379.9 |
| Negotiation COD | --- | 3.4 | --- | 25.0 | 28.4 | 28.4 |
| Subtotal | 270.0 | 37.6 | 25.0 | 345.7 | 678.3 | 408.3 |
| Ceiling at 25% | 67.5 | 9.4 | 6.3 | 84.6 | 167.8 | 100.3 |
| Ceiling price | 337.5 | 47.0 | 31.3 | 430.3 | 846.1 | 508.6 |
| *Possible negotiation losses* | | | | | | |
| C.O. 24 | (16.2) | --- | --- | --- | (16.2) | --- |
| Ceiling at 22.5% | --- | (0.9) | (0.6) | (8.5) | (10.0) | (10.0) |
| COD (Lose 25%) | --- | (1.0) | --- | (7.7) | (8.7) | (8.7) |
| ARS/IDS Claim (25%) | --- | (11.3) | --- | --- | (11.3) | (11.3) |
| Schedule change | --- | --- | (23.3) | --- | (23.3) | (23.3) |
| Subtotal—losses | (16.2) | (13.2) | (23.9) | (16.2) | (69.5) | (53.3) |
| Negotiated ceiling | 321.3 | 33.8 | 7.4 | 414.1 | 776.6 | 455.3 |
| **II. PERFORMANCE STATUS** | | | | | | |
| *Estimated costs at completion* | | | | | | |
| (Autonetics estimate)[1] | 386.8 | 34.2 | 25.0 | 320.7 | 766.7 | |
| *Estimated COD expenditures* | | | | | | |
| Known | | | | | 3.7 | |
| Anticipated | | | | | 22.5 | |
| Subtotal—COD | | | | | 26.2 | |
| Total costs | | | | | 792.9 | |
| **III. PROGRAM PROFIT/(LOSS)** | | | | | (16.3) | |

[1]The amounts comprising the $766.7 million estimated costs at completion were obtained from a companion document dated Oct. 16, 1969, entitled "Mark II Financial Summary—Analysis of Overrun."

we believe are reasonable assumptions where these appeared necessary under the circumstances. Some of our assumptions indicate negotiation results at figures lower than those reflected in the positions which we have taken with General Dynamics. While we believe those positions to be supportable, for purposes of our forecast, we have elected to make some discounts in the amounts involved. These are reflected in the ranges set forth on the attached Financial Summary.

> (S) S. F. EYESTONE
> *President*
> *Autonetics Division*

> (S) D. R. MACBLANE
> *Vice President, Finance*
> *Autonetics Division*

After taking into account changes in estimates since the date of the previous contract analysis, the financial summary projected in the best case a break-even on the overall contract, and in the worst case, a $31,100,000 loss, as follows:

|  | *Range* (in millions) | |
| --- | --- | --- |
| Proposed target cost less correction-of-deficiencies | $660.3 | $660.3 |
| Correction-of-deficiency provision (discounted by approximately $10 million from that proposed) | 28.4 | 28.4 |
| Total target cost | 688.7 | 688.7 |
| Proposed ceiling at 25 percent of target cost | 170.5 | 170.5 |
| Proposed ceiling price | 859.2 | 859.2 |
| Loss on negotiation of C.O. 24 | 16.2 | 16.2 |
| Adjusted ceiling price | 843.0 | 843.0 |
| Possible negotiation losses: | | |
| Ceiling—23 percent | (8.3) | |
| —21 percent | | (16.6) |
| ARS/IDS Claim —(25-percent loss) | (14.5) | |
| —(40-percent loss) | | (22.8) |
| C.O. 53—Negotiate target of $10 million | (18.5) | |
| —Negotiate target of 6 million | | (23.0) |
| Total | (41.3) | (62.4) |
| Estimated ceiling (adjusted for possible negotiation losses) | 801.7 | 780.6 |
| Estimate-at-completion including released correction-of-deficiencies | 779.0 | 784.0 |
| Provision for unallowable IR & D | 2.7 | 2.7 |
| Provision for potential correction-of-deficiencies cost | 20.0 | 25.0 |
| Total estimated cost | 801.7 | 811.7 |

| | | |
|---|---:|---:|
| Program profit/(loss) ......................................................... | 0 | ($31.1) |
| Loss written off at Sept. 30, 1969............................................ | $16.2 | 16.2 |
| Program profit/(loss)—remainder after Sept. 30, 1969, loss writeoff covering C.O. 24...................................... | 16.2 | (14.9) |

Although Rockwell's analysis of P.O. 181 at times showed a wide variance between the best and worst possible outcomes, Rockwell's management determined in early November that the most likely outcome was a $16,250,000 loss, or the difference between the sought-after and the negotiated ceiling prices on C.O. 24. Notwithstanding the fact that the ceiling price differential was used to peg the exact amount of the loss, the $16,250,000 loss was a loss on the overall contract and was not intended to relate solely to C.O. 24.[11] Rockwell took the estimated loss into income for the taxable year ended September 30, 1969, by crediting its work-in-process inventory and debiting cost of sales for the amount of the loss. The actual bookkeeping entry to reflect these adjustments was made on November 5, 1969.

As of September 30, 1969, Rockwell had incurred $418,373,980 in costs under P.O. 181. By the end of October 1969, Rockwell's incurred costs had risen to $428,700,000. At that time, it was also contractually obligated to pay an additional $149,700,000 to its subcontractors for future hardware deliveries.

Rockwell's financial and tax accounting for inventory, sales, and cost of sales under P.O. 181 for the fiscal years ended September 30, 1966, 1967, 1968, and 1969 was as shown on page 800.

In determining its ending inventory under P.O. 181 for all relevant years, Rockwell did not take a physical count of items on hand as of the close of any taxable year. Nor did it determine the replacement or reproduction cost of such inventory. In addition, no attempt was made to determine the net realizable value of the P.O. 181 inventory on an article-by-article basis as of September 30, 1969. As indicated in the findings of fact entitled "Accounting Procedures," the value assigned to ending inventory was essentially a residual or fall-

[11]Rockwell's cost accounting system did not segregate costs incurred under P.O. 181 by change order.

|  | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|
| GROSS SALES | 0 | 0 | $91,448,000 | $158,630,000 |
| Less: Cost of sales |  |  |  |  |
| Beginning inventory | 0 | $4,068,694 | $67,209,309 | $125,865,918 |
| Cost of material, labor, etc. | $4,068,694 | 63,140,615 | 150,104,609 | 201,060,062 |
| Less: Ending inventory | (4,068,694) | (67,209,309) | (125,865,918) | (152,045,980) |
|  | 0 | 0 | (91,448,000) | (174,880,000) |
| Net income (loss) | 0 | 0 | 0 | (16,250,000) |

out figure which represented the difference between total costs incurred to date and the amount charged to cost of sales to date (including inventory writedowns, if any). The amount recorded as cost of sales for the taxable year in issue ($174,880,000) was comprised of two components: (1) The cost of deliveries during the year as determined under Rockwell's job-order cost accounting system ($158,630,000), and (2) the amount of the inventory writedown reflecting the projected loss on P.O. 181 ($16,250,000).

### Financial Statement Presentation of P.O. 181

During the year in issue, Rockwell had retained the public accounting firm of Haskins & Sells, certified public accountants, to examine Rockwell's financial statements for the fiscal year ended September 30, 1969, and express its opinion on those statements.

As part of their examination, the Haskins & Sells auditors conducted various tests to assure themselves that Rockwell's accounting and internal control systems were reliable. These tests included physical observation of portions of the work-in-process inventory. However, the auditors did not take a physical count of the items in inventory at yearend, nor was it physically practicable for them to do so, or necessary, under generally accepted auditing standards.

During two meetings in late October and early November 1969, representatives of Haskins & Sells met with Rockwell officials to discuss the proposed writedown on the F–111 avionics contract. Based on their discussions with management, a review of the contract documents, and an evaluation of Rockwell's estimating procedures, the auditors determined that management's estimate of a $16,250,000 loss on the overall contract was fair and reasonable, based on the information available at that time. Thus, they concluded that an inventory writedown in this amount was required under generally accepted accounting principles (GAAP) in order to state fairly the results of operations for the fiscal year ended September 30, 1969. Had Rockwell not recognized the loss on P.O. 181 for the fiscal year, Haskins & Sells would have considered modifying its opinion on Rockwell's financial statements for that year to state a reservation regarding a departure from GAAP.

The consolidated balance sheet of Rockwell as of September 30, 1969, listed the following categories of costs as current assets:

Unreimbursed costs and accrued profits to be billed,
  principally related to U.S. Government contracts .............. $217,916,000
Inventories, less progress payment of $204,221,000 .............. 492,488,000

Rockwell's accounting procedures regarding inventories were described in note 4 to the 1969 financial statements as follows:

### 4. INVENTORIES

Inventories are stated at the lower of cost or market. The major portion of the inventories, before reduction for progress payments wherein title to the related inventories vests in the United States Government, represents accumulated costs under fixed-price-type contracts and subcontracts in process (principally United States Government) less credits for partial deliveries and reductions to estimated realizable values where necessary.

Note 3 described Rockwell's accounting procedures with respect to its sales contracts, and also disclosed the chargeoff of the estimated loss on P.O. 181 against fiscal 1969 earnings:

### 3. SALES CONTRACTS

Sales under United States Government contracts and subcontracts accounted for 61% of total sales in 1969 and 67% in 1968. Approximately 58% of the 1969 sales under United States Government contracts and subcontracts were of the cost type, and approximately 15% were of the fixed-price-incentive type. Many of these contracts provide for cost or performance incentives, whereunder increases in fees or profits are received for surpassing stated targets, or decreases in fees or profits are experienced for failure to achieve such targets.

Sales are recorded under cost-type contracts for costs, as incurred, plus a proportion of the profit expected to be realized on the contract in the ratio that costs incurred bear to total estimated costs. Sales are recorded under fixed-price-incentive contracts as deliveries are made at the cost of items delivered plus a proportion of the profit expected to be realized on the contract. However, certain performance incentives for which a reasonable prediction of accomplishment cannot be made, generally involving a single opportunity to accomplish a test or demonstration in accordance with established performance criteria, are included in sales at the time there is sufficient information to relate performance to targets or other criteria. Profits expected to be realized on these contracts are based on the Corporation's estimates of total sales value and cost at completion of the contracts. These estimates are reviewed and revised periodically throughout the lives of the contracts, and adjustments to profits resulting from such revisions are recorded in the accounting period in which the revisions are made. Losses on contracts are recorded in full as they are identified.

In accordance with this policy, the Corporation charged in full to earnings

for the 1969 year a loss on the F–111 avionics fixed-price-incentive contract. The loss reflected the reaching of a final agreement, after the end of the fiscal year, on the initial portion of that contract at a price less than the Corporation had anticipated in view of prior tentative agreements. The work under the overall contract is about half completed, taking into account changes and additions. The Corporation believes that no further loss on the overall contract will be incurred, but future results of operations will necessarily be affected by actual developments as to cost performance and negotiations on the remaining portion of the contract.

On November 12, 1969, Haskins & Sells rendered its opinion on Rockwell's financial statements for the fiscal year ended September 30, 1969. The opinion letter provided, in part, as follows:

As stated in the last paragraph of Note 3, the Corporation charged earnings for the year ended September 30, 1969 with an amount believed to be the entire loss on its F–111 avionics contract based on its current estimates. Future results of operations will be affected to the extent these estimates may be subsequently revised.

The recognition of the estimated loss on P.O. 181 was required under GAAP, although not necessarily by way of a lower of cost or market adjustment to the value of the contract ending inventory.

### Events Relating to Periods After Sept. 30, 1969

During the fiscal year ended September 30, 1976, Rockwell completed its work under P.O. 181. Final deliveries on the contract took place in fiscal 1975. The amounts reported by Rockwell for financial and Federal tax purposes for its sales, cost of goods sold, and net income or loss under P.O. 181 for the years ended September 30, 1968 through 1976, were as follows:

| Year ended Sept. 30— | Sales | Cost of goods sold | Income (loss) |
|---|---|---|---|
| 1968 | $91,448,000 | $91,448,000 | --- |
| 1969 | 158,630,000 | 174,880,000 | ($16,250,000) |
| 1970 | 185,136,000 | 185,136,000 | --- |
| 1971 | 199,309,000 | 199,309,000 | --- |
| 1972 | 165,454,000 | 165,454,000 | --- |
| 1973 | 38,163,000 | 38,163,000 | --- |
| 1974 | 7,299,000 | 2,143,000 | 5,156,000 |
| 1975 | 58,000 | (1,045,000) | 1,103,000 |
| 1976 | --- | (165,000) | 165,000 |
| Total | 845,497,000 | 855,323,000 | (9,826,000) |

Rockwell's reported net profits for the taxable years 1974, 1975, and 1976 reflected settlements of claims by General

Dynamics, Air Force and subcontractors, and transfers of equipment or surplus material to other Government contracts.

In a private letter ruling dated April 19, 1974, the Internal Revenue Service granted Rockwell permission to change its method of accounting for its long-term Government contracts to the completed contract method of accounting. However, the change was applicable only to such contracts commenced on or after October 1, 1972. Accordingly, the change of accounting method did not apply to P.O. 181.

In his notice of deficiency dated December 29, 1976, respondent increased petitioner's work-in-process ending inventory, and, hence, its taxable income, for the taxable year ended September 30, 1969, by the amount of $16,250,000 to reflect the "disallowed estimated loss claimed on the F–111 contract."

## OPINION

In June 1966, petitioner's predecessor in interest, North American Aviation, Inc., entered into a subcontract with General Dynamics, the prime contractor for the U.S. Air Force responsible for the development of the F–111 aircraft. The subcontract, referred to by the parties as Purchase Order 181 (P.O. 181), called for the research, development, and production of specialized attack radars, navigation devices, cockpit instrument panels and computers for the avionics systems of the FB–111A strategic bomber and the F–111D tactical fighter- bomber. Petitioner's Autonetics Division was assigned the responsibility for fulfilling the contract.

Petitioner's stated method of reporting the income from P.O. 181 and its other fixed-price contracts was a variant of the accrual shipment method.[12] Under this method, petitioner

---

[12]There are four basic methods of tax accounting available to long-term contractors. See generally Schneider, "Tax Planning for Long-Term Contractors and Manufacturers Under New Final Regs.," 44 J. Tax. 210 (1976). The contractor may elect to use the cash or accrual methods specified in sec. 446(c), provided the method clearly reflects income as required by sec. 446(b). See, e.g., *Magnon v. Commissioner*, 73 T.C. 980, 1002–1006 (1980), and *C. A. Hunt Engineering Co. v. Commissioner*, T.C. Memo. 1956–248 (use of cash method held to reflect income clearly); see also sec. 1.451–3(a)(1), Income Tax Regs., as amended by T.D. 7397, 1976–1 C.B. 115 (authorizing the use of the special long-term methods as well as any other method which clearly reflects income). The accrual method is specifically referenced in the advance payment regulations which were issued in 1971 and amended in 1976. Sec. 1.451–5(b)(3), Income Tax Regs., states that a long-term accrual method consists of any method of

would estimate each year the overall profit or loss which it expected to realize on the contract. If a net profit was projected, petitioner would report a pro rata portion of the estimated profit as income for the taxable year, based on the number of finished end items which were delivered during such year. On the other hand, if a net loss was projected, petitioner would take the entire loss into income through the vehicle of a lower of cost or market (LCM) adjustment to its ending inventory.[13] Petitioner and its predecessors had elected to value their inventories under the LCM method since 1930.

The first deliveries under P.O. 181 took place in the fiscal year ended September 30, 1968, but petitioner reported no income or loss on these deliveries because at that time it projected a break-even outcome on the overall contract. In early November 1969, petitioner projected an overall contract loss of $16,250,000 based on revised estimates of the additional costs to completion and the selling price to be received for the work performed. Petitioner took this loss into income for the fiscal year ended September 30, 1969, by writing down its ending work-in-process inventory under P.O. 181 by the amount of the forecasted loss.[14] The writedown was also claimed for financial reporting purposes and was determined by Rockwell's independent certified public accountants to be

---

accounting under which income is accrued when, and costs are accumulated until, the subject matter of the contract is shipped, delivered, or accepted.

In addition to the cash and accrual methods, the contractor may elect to use the completed contract or percentage of completion methods authorized by sec. 1.451–3, Income Tax Regs. Prior to 1976, there was some uncertainty as to whether manufacturers were permitted to use the long-term methods, since the regulations limited their application to "building, installation, or construction" contracts. Nevertheless, there was judicial authority to support the use of such methods by manufacturers. See *Rice, Barton & Fales, Inc. v. Commissioner*, 41 F.2d 339 (1st Cir. 1930); *Grays Harbor Motorship Corp. v. United States*, 71 Ct. Cl. 167, 45 F.2d 259 (1930), cert. denied 284 U.S. 627 (1931). In 1976, the regulations were amended to encompass, specifically, manufacturing contracts involving unique goods or items requiring more than 12 months to complete. See sec. 1.451–3(b)(1), Income Tax Regs., as amended by T.D. 7397, 1976–1 C.B. 115.

[13] Sec. 1.61–3, Income Tax Regs., provides that gross income in a manufacturing or merchandising business equals gross sales less cost of goods sold. Cost of goods sold is generally determined by subtracting ending inventory (as determined under sec. 471 and the regulations thereunder) from the goods available for sale during the year (i.e., beginning inventory plus purchases). Thus, the lower the valuation assigned to ending inventory the higher the cost of sales, and hence a lower gross income.

[14] Hereinafter, the term "work in process" as it relates to P.O. 181 will be deemed to refer to all materials acquired or produced under the contract, including raw materials not yet placed in production.

in conformity with generally accepted accounting principles (GAAP). Although the loss claimed was an estimated loss on the overall contract, Rockwell had only incurred approximately one-half of the total estimated contract costs as of yearend. The final deliveries under P.O. 181 took place in fiscal 1975, and the net loss ultimately realized on the contract proved to be $9,826,000 rather than the predicted loss of $16,250,000.

The basic issue we are asked to decide in this case is whether petitioner improperly valued its P.O. 181 work in process at the close of the taxable year in issue by using a market value which was $16,250,000 lower than its actual cost, thereby increasing cost of sales and decreasing taxable income by corresponding amounts. Respondent, relying on his broad authority under sections 446(b) and 471 to reject a particular method of inventory accounting which does not clearly reflect income, maintains that his disallowance of the alleged inventory writedown was not "plainly arbitrary" under the standard set forth in *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979), and cites the following reasons:

(1) The costs incurred by Rockwell under P.O. 181 were not inventoriable costs within the meaning of section 1.471–1, Income Tax Regs., since title to all property manufactured or acquired under the contract was at all times vested in the Government; therefore, petitioner was not entitled to use the methods of inventory valuation provided in sections 1.471–2(c) and 1.471–4, Income Tax Regs., which specify the circumstances under which inventory may be valued below cost;

(2) Petitioner's treatment of the contract costs as inventory did not conform with GAAP applicable to such contracts;

(3) Even assuming the costs were properly classified as inventory under section 471 and the accompanying regulations, the inventory writedown claimed by petitioner nevertheless failed to reflect its income clearly because:

(a) The writedown did not conform to the requirements of either section 1.471–2(c) or 1.471–4, Income Tax Regs.;

(b) The writedown was inconsistent with petitioner's professed method of accounting for its fixed-price contracts (i.e., the accrual-shipment method), and was also inconsistent with the completed-contract method of accounting which petitioner had in effect adopted with respect to P.O. 181 by failing to

report any income or loss on contract deliveries in the preceding year;

(c) The writedown created a distortion of income for the taxable year because it allowed the deduction of an anticipated estimated loss on a partially completed contract.

Petitioner maintains that respondent's determination was plainly arbitrary and advances the following arguments in support of its position:

(1) The provision in section 1.471–1, Income Tax Regs., which includes goods in inventory only if title thereto is vested in the taxpayer, should not be considered an absolute prerequisite to inventory classification under the facts of this case where the petitioner bore the risk of loss with respect to the P.O. 181 work in process and the title provision in the contract served only to provide the Government with a security interest in the funds advanced pursuant to the progress-payments clause;

(2) The classification of such contract costs as inventory was permitted under GAAP;

(3) The inventory writedown clearly reflected income because:

(a) Rockwell's determination of the market value of its inventory was in accord with both regulations sections 1.471–2(c) and 1.471–4(b) and (c), and consistent with the application of the net realizable value method to fixed-price manufacturing contracts in *E. W. Bliss Co. v. United States*, 224 F. Supp. 374 (N.D. Ohio 1963), affd. 351 F.2d 449 (6th Cir. 1965), and *Space Controls, Inc. v. Commissioner*, 322 F.2d 144 (5th Cir. 1963), revg. a Memorandum Opinion of this Court;

(b) Rockwell consistently followed its accounting method for fixed-price contracts, in general, and P.O. 181, in particular, and did not report income from the latter on the completed-contract method as alleged by respondent; and

(c) The writedown of its inventory to reflect the entire projected loss on P.O. 181 was in accordance with GAAP.

Further, petitioner contends that if it is not entitled to use an inventory method of accounting with respect to P.O. 181 costs, it should nevertheless be permitted to recognize the estimated loss on the contract because (1) the loss recognition resulted in a clear reflection of income, and (2) even if it did

not, respondent, by failing to prescribe an alternative method of accounting for the contract costs, has abdicated his discretionary authority under section 446(b) to require petitioner to change its existing method.

Because inventory valuation constitutes a method of accounting,[15] the treatment of inventories for tax purposes is governed by both sections 446 and 471. Section 446(a) provides that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." However, pursuant to section 446(b), "if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary * * *, does clearly reflect income." Section 471 provides that "Whenever in the opinion of the Secretary * * * the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary * * * may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income."

In *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979), the Supreme Court described the breadth of the Commissioner's discretionary authority under these provisions as follows:

It is obvious that on their face, §§ 446 and 471, with their accompanying Regulations, vest the Commissioner with wide discretion in determining whether a particular method of inventory accounting should be disallowed as not clearly reflective of income. This Court's cases confirm the breadth of this discretion. In construing § 446 and its predecessors, the Court has held that "[t]he Commissioner has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." *Commissioner* v. *Hansen*, 360 U.S. 446, 467 (1959). Since the Commissioner has "[m]uch latitude for discretion," his interpretation of the statute's clear-reflection standard "should not be interfered with unless clearly unlawful." *Lucas* v. *American Code Co.*, 280 U.S. 445, 449 (1930). To the same effect are *United States* v. *Catto*, 384 U.S. 102, 114 (1966); *Schlude* v. *Commissioner*, 372 U.S.

---

[15]According to sec. 1.446–1(a)(1), Income Tax Regs., the term "method of accounting" includes not only the overall method of accounting used by the taxpayer, but also the accounting treatment of any particular item. See also sec. 1.446–1(e)(2)(ii)(c), Income Tax Regs., added to the regulations in 1970 by T.D. 7073, 1970–2 C.B. 98, which states that a change in the method of identifying or valuing items in inventory constitutes a change in method of accounting.

128, 133–134 (1963); *American Automobile Assn.* v. *United States,* 367 U.S. 687, 697–698 (1961); *Automobile Club of Michigan* v. *Commissioner,* 353 U.S. 180, 189–190 (1957); *Brown* v. *Helvering,* 291 U.S. 193, 203 (1934). In construing § 203 of the Revenue Act of 1918, 40 Stat. 1060, a predecessor of § 471, the Court held that the taxpayer bears a "heavy burden of [proof]," and that the Commissioner's disallowance of an inventory accounting method is not to be set aside unless shown to be "plainly arbitrary." *Lucas* v. *Structural Steel Co.,* 281 U.S. 264, 271 (1930). [439 U.S. at 532–533.]

Thus, petitioner's burden in this case is to establish that respondent was plainly arbitrary in disallowing the claimed inventory writedown. In resolving this issue, we are mindful that section 471 sets forth two distinct tests which an inventory method of accounting must satisfy: (1) The method used must conform as nearly as may be to the best accounting practice in the trade or business (i.e., GAAP),[16] and (2) it must clearly reflect income. The regulations, however, indicate that compliance with the second requirement depends at least to some degree on compliance with the first. Section 1.471–2(b), Income Tax Regs., provides as follows: [17]

It follows, therefore, that inventory rules cannot be uniform but must give effect to trade customs which come within the scope of the best accounting practice in the particular trade or business. In order clearly to reflect income, the inventory practice of a taxpayer should be consistent from year to year, and greater weight is to be given to consistency than to any particular method of inventorying or basis of valuation so long as the method or basis used is substantially in accord with secs. 1.471–1 to 1.471–9. An inventory that can be used under the best accounting practice in a balance sheet showing the financial position of the taxpayer can, as a general rule, be regarded as clearly reflecting his income.

Similarly, section 1.446–1(a)(2), Income Tax Regs., states that a method of accounting will ordinarily be regarded as clearly reflecting income if it reflects the consistent application of generally accepted accounting principles in accordance with accepted conditions or practices in that trade or business. Thus, under the regulatory scheme, a method of inventory accounting which is (1) in accordance with GAAP, (2) consis-

---

[16]In *Thor Power,* the Supreme Court stated that the term "best accounting practice" is synonymous with GAAP. *Thor Power Tool Co. v. Commissioner,* 439 U.S. 522, 532 (1979).

[17]This regulation was amended in 1973 by T.D. 7285, 1973–2 C.B. 163, to delete the entire last sentence as well as the word "substantially" in the preceding sentence. In addition, the reference to "section 1.471–9" was replaced with "section 1.471–11." However, these amendments are not applicable to the taxable year in issue. See *Thor Power Tool Co. v. Commissioner, supra* at 539 n. 16.

tently applied, and (3) substantially in accord with the section 471 regulations, will ordinarily be regarded as clearly reflecting income.

From what we can make out of respondent's argument on brief,[18] respondent appears to contend that petitioner's inventory writedown did not satisfy any of these criteria. While the evidence tends to suggest otherwise with respect to the first two, we are not persuaded that the writedown was substantially in accord with the governing regulations. We conclude, therefore, that respondent did not act in a plainly arbitrary manner in disallowing it.

We direct our attention to the specific provisions of the regulations concerning the use of inventories. At the threshold, respondent maintains that petitioner is precluded from using an inventory method of accounting altogether because it did not hold title to the merchandise as required by section 1.471–1, Income Tax Regs.[19] That regulation states in part that "Merchandise should be included in the inventory only if title thereto is vested in the taxpayer." Petitioner concedes that under the progress payments provision of P.O. 181, title to all property acquired or produced under the contract automatically vested in the Government. Nevertheless, petitioner argues that the title regulation should either be invalidated or given an expansive interpretation to permit the use of an inventory-method accounting with respect to such property. Further,

_____

[18]Not only did respondent's argument lack clarity, but also his requested findings of fact were in some respects repetitive and confusing.

[19]Sec. 1.471–1. Need for inventories.

In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. The inventory should include all finished or partly finished goods and, in the case of raw materials and supplies, only those which have been acquired for sale or which will physically become a part of merchandise intended for sale, in which class fall containers, such as kegs, bottles, and cases, whether returnable or not, if title thereto will pass to the purchaser of the product to be sold therein. *Merchandise should be included in the inventory only if title thereto is vested in the taxpayer.* Accordingly, the seller should include in his inventory goods under contract for sale but not yet segregated and applied to the contract and goods out upon consignment, but should exclude from inventory goods sold (including containers), title to which has passed to the purchaser. A purchaser should include in inventory merchandise purchased (including containers), title to which has passed to him, although such merchandise is in transit or for other reasons has not been reduced to physical possession, but should not include goods ordered for future delivery, transfer of title to which has not yet been effected. (But see sec. 1.472–1.) [Emphasis added.]

petitioner maintains that *Gunderson Bros. Engineering Corp. v. Commissioner*, 16 T.C. 118 (1951), in which this Court sustained the Commissioner's rejection of an inventory writedown in part because title to work in process under two construction contracts was at all times vested in the Government, was incorrectly decided and is, in any event, distinguishable from the present case.

We recognize that the question of title is of considerable importance to Government contractors, in general, and to members of the defense industry, in particular, since Government contracts providing for progress payments frequently contain title clauses similar to the one involved in this case. A decision elevating the title requirement in the regulations to the status of an absolute and immutable prerequisite for inventory classification would have the effect of excluding work in process under such contracts not only from the inventory rules provided under section 471, but also from the rules governing the last-in, first-out (LIFO) method of inventory accounting under section 472.[20] See sec. 1.472–1(a), Income Tax Regs. Petitioner's arguments in support of a flexible interpretation of the title requirement, as set forth in its excellent brief, warrant serious consideration. However, because we find that petitioner's inventory writedown did not conform to the other requirements of the regulations, we think it best to leave the resolution of this important question to a case in which it is squarely presented. Accordingly, we express no opinion on whether the costs incurred under P.O. 181 constitute inventory within the meaning of section 1.471–1, Income Tax Regs., and for purposes of the ensuing discussion, we will assume that petitioner properly employed an inventory method of accounting with respect to such costs.[21]

Writedowns from cost to market value are expressly permitted by the inventory regulations in certain situations. They are recognized as limited exceptions to the longstanding

---

[20]Indeed, this is precisely the position which respondent recently took in Technical Advice Memorandum 8122001.

[21]Thus, it is unnecessary for us to determine whether the use of an inventory method of accounting with respect to P.O. 181 was, in accordance with GAAP, applicable to such contracts.

principle of annual tax accounting which prohibits the recognition of unrealized losses.[22] See *Space Controls, Inc. v. Commissioner*, 322 F.2d 144, 148 (5th Cir. 1963); *Sharp v. Commissioner*, 224 F.2d 920, 924 (6th Cir. 1955); *Thor Power Tool Co. v. Commissioner*, 64 T.C. 154, 169 (1975), affd. 563 F.2d 861 (7th Cir. 1977), affd. 439 U.S. 522 (1979). In valuing their inventories, taxpayers are allowed to use one of two basic methods: (1) Cost, or (2) cost or market, whichever is lower. See sec. 1.471–2(c), Income Tax Regs. The rules governing the LCM method are set forth in section 1.471–4, Income Tax Regs.: [23]

Sec. 1.471–4. Inventories at cost or market, whichever is lower.

(a) Under ordinary circumstances and for normal goods in an inventory, "market" means the current bid price prevailing at the date of the inventory for the particular merchandise in the volume in which usually purchased by the taxpayer, and is applicable in the cases—

(1) Of goods purchased and on hand, and

(2) Of basic elements of cost (materials, labor, and burden) in goods in process of manufacture and in finished goods on hand; exclusive, however, of goods on hand or in process of manufacture for delivery upon firm sales contracts (i.e., those not legally subject to cancellation by either party) at

---

[22]That the regulations permit writedowns to market in certain situations is no doubt due to the Commissioner's recognition of the widespread use of the LCM method for financial accounting purposes. The LCM method had its genesis in the accounting principle of conservatism, which reflects the accountant's preference for understating rather than overstating financial net income and thus requires the recognition of unrealized losses under certain circumstances. See P. Jannis, C. Poedtke & D. Zeigler, Managing and Accounting for Inventories 142–161 (3d ed.). Under generally accepted accounting principles, "market" is generally determined by reference to replacement cost, the notion being that a decline in the cost to replace a given item will normally be accompanied by a corresponding decline in its utility, i.e., the selling price it can command. However, the use of replacement cost is improper where it exceeds net realizable value (defined as sales price less estimated costs of completion and disposal), or where it is less than net realizable value, less a normal profit margin. See AICPA Accounting Research and Terminology Bulletins, Accounting Research Bulletin No. 43, "Restatement and Revision of Accounting Research Bulletins," ch. 4, statement 6, at 31–32 (1953).

It should be noted that the regulations governing cost to market writedowns differ from the financial accounting rules in a number of respects. For example, the regulations carefully limit the circumstances under which inventories may be valued below replacement cost at net realizable value. In addition, the regulations do not sanction the valuation of inventories below net realizable value in order to take into account the seller's normal profit margin. But see *E. W. Bliss Co. v. United States*, 224 F. Supp. 374 (N.D. Ohio 1963), affd. 351 F.2d 449 (6th Cir. 1965) (Court upheld the taxpayer's valuation of inventory at net realizable value less a normal profit margin on the ground that such practice was in accord with GAAP and consistently applied.)

[23]Substantially similar versions of this regulation have been in effect since 1920. See art. 1584, Regs. 45. The original version was promulgated under the authority of sec. 203, Revenue Act of 1918, 40 Stat. 1060 (the forerunner of present sec. 471).

fixed prices entered into before the date of the inventory, under which the taxpayer is protected against actual loss, which goods must be inventoried at cost.

(b) Where no open market exists or where quotations are nominal, due to inactive market conditions, the taxpayer must use such evidence of a fair market price at the date or dates nearest the inventory as may be available, such as specific purchases or sales by the taxpayer or others in reasonable volume and made in good faith, or compensation paid for cancellation of contracts for purchase commitments. Where the taxpayer in the regular course of business has offered for sale such merchandise at prices lower than the current price as above defined, the inventory may be valued at such prices less direct cost of disposition, and the correctness of such prices will be determined by reference to the actual sales of the taxpayer for a reasonable period before and after the date of the inventory. Prices which vary materially from the actual prices so ascertained will not be accepted as reflecting the market.

(c) Where the inventory is valued upon the basis of cost or market, whichever is lower, the market value of each article on hand at the inventory date shall be compared with the cost of the article, and the lower of such values shall be taken as the inventory value of the article.

Thus, section 1.471–4(a), Income Tax Regs., defines "market" for normal goods in an ordinary market as the current bid price prevailing at the inventory date for such goods. The term "current bid price" has been held to be synonymous with replacement cost, i.e., the price the taxpayer would have to pay on the open market to purchase or reproduce its inventory. *Thor Power Tool Co. v. Commissioner*, 439 U.S. at 534; *D. Loveman & Son Export Corp. v. Commissioner*, 34 T.C. 776, 796 (1960), affd. 296 F.2d 732 (6th Cir. 1961), cert. denied 369 U.S. 860 (1962). Where there is an inactive replacement market for the inventory, the first sentence of regulations section 1.471–4(b) permits the use of other evidence of fair market value, such as specific purchases or sales by the taxpayer or others, to establish the current bid price.

In certain situations, inventories may be valued below the current bid price. The so-called "abnormal goods exception" appears in the second sentence of regulations section 1.471–4(b). Where the taxpayer has actually offered its merchandise for sale at a price less than replacement cost, it is permitted to value the inventory at net realizable value (i.e., selling price less direct cost of disposition). The selling price is to be determined by reference to actual sales of the taxpayer for a reasonable period before and after the date of the inventory.

A second exception to the replacement cost rule is found in

section 1.471–2(c), Income Tax Regs. It provides in relevant part:

> The bases of valuation most commonly used by business concerns and which meet the requirements of section 471 are (1) cost and (2) cost or market, whichever is lower. * * * Any goods in an inventory which are unsalable at normal prices or unusable in the normal way because of damage, imperfections, shop wear, changes of style, odd or broken lots, or other similar causes, including second-hand goods taken in exchange, should be valued at bona fide selling prices less direct cost of disposition, whether subparagraph (1) or (2) of this paragraph is used, or if such goods consist of raw materials or partly finished goods held for use or consumption, they shall be valued upon a reasonable basis, taking into consideration the usability and the condition of the goods, but in no case shall such value be less than the scrap value. Bona fide selling price means actual offering of goods during a period ending not later than 30 days after inventory date. * * *

This provision permits damaged or obsolete inventory to be valued at net realizable value and is available regardless of whether the taxpayer uses the cost or LCM method of inventory valuation. However, unlike the net realizable value exception in section 1.471–4(b), Income Tax Regs., the selling prices must be substantiated by actual offerings for sale at such prices within 30 days of the inventory date.

In *Thor Power Tool Co. v. Commissioner, supra,* the Supreme Court discussed these exceptions to replacement-cost valuation in the context of "excess" inventory writedowns. The taxpayer, a power tool manufacturer, used the LCM method of valuing its inventories. Because of the difficulty of forecasting consumer demand, the taxpayer produced large quantities of spare parts in order to avoid the necessity of costly additional production runs. In 1964, new management determined that a number of inventory items, consisting mostly of spare parts, were in excess of any reasonably anticipated future demand and wrote them down to net realizable value, which was generally equal to scrap value.

Although the writedown was conceded to be in accordance with GAAP, the Commissioner contended that it did not clearly reflect income because it was based on subjective estimates of future demand and did not conform to the specific regulations governing the application of the LCM method. Since the taxpayer had not attempted to ascertain reproduction or replacement cost, its task was to prove that the

writedown fell within the scope of either section 1.471–2(c) or section 1.471–4(b), Income Tax Regs. According to the Supreme Court, the taxpayer could avail itself of these exceptions only if it could "substantiate its lower inventory valuation by providing evidence of actual offerings, actual sales, or actual contract cancellations." 439 U.S. at 535. In holding that the subnormal goods exception did not apply, the Court observed that the taxpayer's excess inventory was normal and indistinguishable from the inventory which was not written down. Further, the Court held that the abnormal goods exception did not apply because the excess inventory was never offered for sale at prices below replacement cost. It concluded that management's "well-educated guess" that some of the inventory would never be sold did not constitute the hard objective evidence of market value required by the regulations. Accordingly, the Court found that the writedown was plainly inconsistent with the regulations and sustained the Commissioner's determination.

Like the taxpayer in *Thor Power*, petitioner does not contend that the replacement cost of its P.O. 181 inventory was less than actual cost. Indeed, petitioner concedes that it made no attempt to determine the replacement cost of such inventory. Instead, petitioner takes the position that its inventory writedown was authorized under both regulations section 1.471–2(c) (subnormal goods exception) and the second sentence of regulations section 1.471–4(b) (abnormal goods exception).

We think the subnormal goods exception has no application here. To begin with, petitioner has failed to produce sufficient objective evidence to demonstrate that the P.O. 181 inventory was worth less than its actual cost of acquisition or manufacture. A detailed discussion of this point follows later in this opinion. More fundamentally, there is no evidence whatsoever that petitioner's P.O. 181 inventory was in any way damaged, obsolete, or otherwise unsuitable for the purpose for which it was manufactured. See *E. W. Bliss Co. v. United States*, 224 F. Supp. 374, 378 n. 1 (N.D. Ohio 1963), affd. 351 F.2d 449 (6th Cir. 1965). Moreover, we think petitioner's reliance on our decision in *McKay Machine Co. v. Commissioner*, 28 T.C. 185 (1957), is misplaced. That case involved a taxpayer which was in the process of building a special mill for a foreign customer

when its application for an export license was denied by the Government. Since there was no alternative market for the partially completed mill, the taxpayer wrote down the cost of the work in process to its scrap or net realizable value at yearend. This Court held that the writedown was proper since the component parts of the mill were akin to obsolete or damaged merchandise. We think the facts of the present case are clearly distinguishable. Whereas in *McKay* the taxpayer had no other potential customers for the mill and no means of recouping its investment other than to sell the steel at scrap value, petitioner's inventory was committed to a firm contract with a ready, willing, and able purchaser. The loss petitioner anticipated on the overall contract was not due to any decline in the fitness or merchantability of the goods being produced, but rather was due to petitioner's failure to attain targeted cost projections and negotiate favorable ceiling prices to compensate for cost overruns. Accordingly, we hold that the writedown is not allowable under section 1.471–2(c), Income Tax Regs.

Petitioner's primary contention is that the writedown was permissible under the exception provided in regulations section 1.471–4(b), which deals with abnormal goods offered for sale at prices below replacement cost. Petitioner relies heavily on *Space Controls, Inc. v. Commissioner*, 322 F.2d 144 (5th Cir. 1963), revg. a Memorandum Opinion of this Court, and *E. W. Bliss Co. v. United States, supra*. Both of these cases permitted writedowns to net realizable value of work in process produced under fixed-price manufacturing contracts. In *Space Controls*, the accrual method taxpayer contracted with the Government to build 382 military cargo trailers for a fixed price of approximately $804 each. Because the trailers were of a special military design not suitable for commercial or civilian use, they had no value outside of the contract beyond scrap value. By the end of the taxable year in issue, the contractor had completed and delivered 96 trailers. The rest of the trailers were completed and shipped the following year. Based on its estimates of the remaining costs to completion,[24] the taxpayer projected a loss on the undelivered units of approxi-

---

[24]The taxpayer's accountants determined that 68.14 percent of the total contract costs had been incurred as of yearend. The remaining costs to completion were estimated to be

mately $360.20, or an aggregate loss of $103,014.15. To reflect this projected loss, the taxpayer wrote down its work-in-process inventory from $194,209.49 to $91,195.34 through an LCM adjustment which the Commissioner subsequently disallowed.

Although it did not fix the exact amount,[25] the Court of Appeals determined that a writedown was permissible under the authority of section 1.471–4(b), Income Tax Regs. Relying on the second sentence of the regulation, the Court reasoned that the contract constituted a sale in the ordinary course of business at a price less than the replacement cost of the finished merchandise. Thus, it concluded, "With [the taxpayer's] stock on hand dedicated to a contract from which it could

---

$138,811.77. As the Court of Appeals observed, this estimate turned out to be quite accurate; the actual costs incurred in the following year totaled $143,073.16.

[25]In the initial hearing of that case, this Court sustained the Commissioner's determination except insofar as it pertained to 16 completed or nearly completed trailers which had not yet been delivered. Both parties appealed. Before the Fifth Circuit, the taxpayer retreated from its earlier position and contended that it was only entitled to a writedown of approximately $60,000, rather than $103,014.15 as previously claimed. It appears from the opinion of the Court of Appeals that the reduced amount claimed by the taxpayer reflected only that portion of the projected contract loss which was attributable to costs actually *incurred* as of yearend. The taxpayer's incurred and projected costs were as follows:

Costs in ending inventory:
Raw materials ................................................. $99,893.56
Work in process .............................................. 94,315.93

194,209.49
Estimated costs to complete .............................. 138,811.77
Total costs of undelivered units ......................... 333,021.26

Costs in ending inventory comprised the following percentage of total costs:

$194,209.49 / $333,021.26 = 0.583174

Applying this percentage to the estimated contract loss (exclusive of losses already recognized on delivered units) yields the following:

$103,014.15
×0.583174

60,075.17

This amount differs slightly from the amount which the taxpayer sought to write down ($60,084.32) based upon estimated rather than actual costs to completion. *Space Controls, Inc. v. Commissioner*, 322 F.2d 144, 147 n. 10 (5th Cir. 1963). Since the precise method by which the taxpayer computed its figure is not disclosed in the opinion, the source of the difference is uncertain. In any event, it seems clear that the taxpayer only intended to claim a pro rata portion of the overall contract loss based on actual costs contained in ending inventory. In allowing the writedown, the Court of Appeals declined to determine a specific dollar amount, leaving it to this Court on remand to ascertain a proper apportionment of the loss between the current and succeeding taxable years. This issue was subsequently settled by the parties.

not legally escape, it would hardly be a true reflection of the financial condition of that concern were its inventory of dedicated goods valued at an amount which it could never get." 322 F.2d at 154. For this reason, and because the evidence indicated that the writedown conformed to the best accounting practice in the trade or business, the Court held in favor of the taxpayer.

The other case relied on by petitioner, *E. W. Bliss Co. v. United States, supra,* involved the inventory regulations under the Internal Revenue Code. These regulations were identical in all relevant respects to the regulations at issue here. The accrual method taxpayer in that case manufactured large custom-order presses used by its customers in the fabrication of steel products. Its work-in-process inventories were valued in the following manner. With respect to all presses which were more than 50-percent complete, the taxpayer would estimate the remaining costs to completion and compare the estimated total cost with the contract sales price less an allowance for a profit margin of 15 percent. To the extent the projected cost of a press exceeded this reduced selling price, the excess would be subtracted from ending inventory through the mechanism of an LCM adjustment. In valuing its inventory at the close of the taxable year in issue, the taxpayer claimed a total of $1,125,600 in such market writedowns.

At trial, the Commissioner argued that the writedowns were improper because the taxpayer did not determine the replacement cost of its partially completed presses as required by the 1939 Code counterpart of section 1.471–4(a), Income Tax Regs. The District Court rejected this argument, stating that that regulation applied only to "normal" goods, whereas the custom-made presses manufactured by the taxpayer were abnormal goods for which no replacement market existed. Thus, the Court held that the contract price provided sufficient evidence of the fair market value of the inventory to justify a writedown to net realizable value under the precursor of section 1.471–4(b), Income Tax Regs.[26]

---

[26]In contrast to *Space Controls,* where the Court of Appeals based its decision on the second sentence of sec. 1.471–4(b), the District Court relied on the first sentence, which permits the use of other evidence of fair market value, such as actual sales or purchases by the taxpayer or others, where there is an inactive or abnormal replacement market for the taxpayer's inventory. From a practical standpoint, it probably makes little difference which

Several other factors influenced the Court's decision. As in *Space Controls*, the Court found that the inventory practices of the taxpayer were in accord with GAAP and had been consistently applied over a number of years. The Court also observed in its findings of fact that no writedowns were considered until the presses were at least 50-percent complete, the stage at which it became unlikely that the remaining costs to completion would exceed the projected costs for that phase of the manufacturing process. As a result, the taxpayer was able to compute the amount of the writedown with substantial accuracy.[27·]

Broadly stated, *Bliss* and *Space Controls* stand for the proposition that replacement cost valuation of inventories should be discarded in favor of net realizable value where the taxpayer is contractually obligated to deliver the goods at a price which is less than the costs expected to be incurred in their manufacture.[28] This rationale, petitioner asserts, is equally applicable here. According to petitioner, the goods produced under P.O. 181 were abnormal goods for which no active replacement market existed, and therefore the proper measure of the utility of the work-in-process inventory was its net realizable value under section 1.471–4(b), Income Tax Regs., as determined by reference to estimates of the contract price to be received and the additional costs to be incurred.

Respondent counters with a myriad of assorted arguments to the effect that *Bliss* and *Space Controls* are distinguishable from the facts here presented. We will address only so much of

sentence is used to support the writedown, at least where specialty goods produced under fixed-price contracts are concerned. However, in the event an active replacement market for the goods does exist, the second sentence might still permit a valuation below replacement cost even though the first sentence would not.

[27]The Court noted that the taxpayer's writedown at one of its plants ($1,018,000) proved to be only $19,000 less than the writedown which would have resulted had the actual, rather than estimated, costs to completion been factored into the computation.

[28]This judicially recognized exception to replacement-cost valuation is actually nothing more than the converse of the rule contained in sec. 1.471–4(a)(2), Income Tax Regs., which states that merchandise produced under a firm sales contract which protects the manufacturer against actual loss must be valued at cost, notwithstanding that replacement cost may be lower. For a discussion of the *Bliss* and *Space Controls* decisions, see L. Schneider, Federal Income Taxation of Inventories, sec. 7.05[3], at 7–23 through 7–25 (1981); Note, "The Tax Parameters of Inventory Valuation," 68 Ky. L. J. 344, 360–377 (1979–80); see also Dasburg, Porche & Flannery, "Inventory Valuation After Thor Power Tool: Analyzing the S. Ct. Decision and its Impact," 50 J. Tax. 200 (1979).

respondent's argument as we think necessary to achieve a satisfactory disposition of petitioner's claim.

At the outset, we disagree with respondent that petitioner's failure to ascertain the replacement cost of its work in process necessarily prevents it from using the net-realizable-value exception provided in regulations section 1.471–4(b). It seems reasonably clear to us that, regardless of how one chooses to apply the precise language of that regulation, the only true measure of the value of goods committed to a fixed-price contract is the contract price, itself. This is particularly so in the present case where the fact that the Government holds legal title to all work in process throughout the various stages of manufacture would apparently leave the contractor no option to sell the merchandise to other buyers or to incorporate the raw materials in other products. That being the case, we think it entirely appropriate, in situations where the contract parameters are reasonably well settled and a loss on the contract can be projected with a sufficient degree of accuracy, to determine market value based on the contract price and the estimated and actual costs incurred without first undertaking the meaningless and, in this case, seemingly impossible task of determining a replacement cost comparative. See *Space Controls, Inc. v. Commissioner, supra* at 154.

We now proceed to what we think is the critical issue in this case: whether there was sufficient objective evidence to permit Rockwell to write down its ending inventory to an amount which allegedly represented net realizable value under section 1.471–4(b), Income Tax Regs. In *Thor Power*, where the taxpayer attempted to justify its writedown partly on the authority of *Space Controls*, the Supreme Court refused to say whether or not it approved of what it termed "the Fifth Circuit's decision to dispense with the 'actual sale' rule of § 1.471–4(b)." 439 U.S. at 536 n. 13. In the same breath, however, the Court distinguished *Space Controls* on the ground that the fixed-price contract in that case served to provide objective evidence of the inventory's reduced value, evidence which the taxpayer in *Thor* was unable to supply. In our judgment, such evidence is also lacking in the present case, and, for that reason, we find that petitioner has failed to satisfy the requirements of regulations section 1.471–4(b).

As a preliminary matter, we should point out that, regard-

less of the accuracy of Rockwell's estimates and projections, the corporation would still not be entitled to write down the *full amount* of the loss for the 1969 fiscal year. The evidence clearly indicates, and Rockwell does not contend otherwise, that the $16,250,000 loss was a loss on the *overall contract*. However, by September 30, 1969, Rockwell had incurred only $418,373,980 of the $855,323,000 of costs ultimately incurred under P.O. 181. Note 3 of the company's 1969 financial statements also indicates that the F–111 contract was "about half completed" at that time. Yet, Rockwell elected to write down its ending inventory by the *entire* amount of the anticipated loss. This is clearly improper because it ignores the fact that part of the loss is attributable to costs which have yet to be incurred as of yearend. By writing down its work in process by the full amount of the loss, Rockwell actually valued its inventory *below* the net realizable value of those particular costs.

We recognize that in *Bliss*, the District Court allowed a writedown equal to the full amount of the projected loss (including an allowance for a normal profit margin), even though the merchandise in question was only 50-percent completed. However, the court was careful to note in its findings of fact that it was unlikely that any excessive costs would be incurred after reaching this stage of completion. In other words, the estimated loss on a given press could generally be traced to cost overruns occurring in the initial stages of manufacture. For this reason, the court concluded that the costs in ending inventory were properly reduced by the entire amount of the projected loss. While we do not necessarily agree with this approach, we note by way of contrast that there is no reliable evidence in this case to indicate that the estimated loss on P.O. 181 was attributable solely to costs already incurred as of the inventory date. Consequently, even if the amount of the loss were adequately substantiated by objective evidence, we still think some apportionment would be required in order to arrive at a proper valuation of the inventory under the LCM method. See the discussion of *Space Controls, Inc. v. Commissioner*, note 25 *supra*.

Putting this aside, however, we are satisfied that the uncertainties surrounding petitioner's loss estimate were far

too great on September 30, 1969, to permit recognition of any portion of the loss (by way of an inventory writedown or otherwise) for that fiscal year. Of particular significance is the fact that the critical event which Rockwell officials believed transformed P.O. 181 from a break-even to a loss contract, i.e., the final agreement on a $321,250,000 ceiling price for C.O. 24, did not occur until *after* the close of the taxable year.

When P.O. 181 was first executed in June 1966, the parties deferred agreement on specific figures for target cost, target price, and ceiling price, and consequently the contract specified only not-to-exceed amounts for these items, as follows:

> Target cost .......................... $132,132,000
> Target price .......................... 145,345,000
> Ceiling price ....................... 171,771,000

However, soon after Rockwell commenced performance, it became apparent to all parties concerned that the not-to-exceed amounts were totally unrealistic. Rockwell experienced substantial cost overruns which were due in part to the fact that existing technology was inadequate to allow cost-efficient performance, and in part because the Air Force, General Dynamics, and Rockwell caused major changes to be made regarding the nature and scope of the work to be performed.

As a result, the parties became embroiled in protracted negotiations in an attempt to establish more reasonable figures for the target and ceiling figures. The negotiations centered on the values related to the so-called "basic" contract, which involved the research, development, and initial production work for the Mark II systems. The target and ceiling amounts for this work were subsequently embodied in Change Order 24 (C.O. 24). In addition, other work was added to the contract which was clearly beyond the scope of performance originally contracted for and which was negotiated separately some time after the close of the fiscal year (referred to as additional P.O. 181 work).

In April 1967, Rockwell proposed the following not-to-exceed amounts for the basic contract (i.e., the C.O. 24 work):

Target cost ..........................$270,000,000
Target price ......................... 297,000,000
Ceiling price ....................... 337,500,000

The Air Force refused to approve these amounts, however, because it felt that it was responsible only for increased costs associated with the basic contract which were clearly "out-of-scope" costs not contemplated by the parties when the contract was originally entered into.

Extensive negotiations took place during August, September, October, and November 1969 as the parties attempted to settle the terms of C.O. 24. In late September, Rockwell officials met with Phillip Whittaker, the Assistant Secretary of the Air Force for procurement matters, and received informal notification that the Air Force would go no higher than a target cost and ceiling price of $257 million and $321,250,000, respectively. On October 7, 1969, the Air Force formally advised Rockwell of its firm position on the C.O. 24 figures. Further meetings followed, and General Dynamics and Rockwell finally agreed to the Air Force terms during meetings held on October 31 and November 1. To serve as an inducement for the agreement, the Air Force agreed to drop proposed delivery penalties and also increased the progress-payments percentage from 70 to 90 percent. By November 14, 1969, all parties had indicated their acceptance of the terms of C.O. 24 in writing, although the document, itself, was not formally executed until May 7, 1970.

Early in November 1969, Rockwell officials reached a consensus that a loss should be recorded on P.O. 181 in the amount of $16,250,000, or the difference between the sought-after and the negotiated ceiling prices on C.O. 24. Although the ceiling price differential served as a benchmark to fix the amount of the loss, the loss was nevertheless intended to relate to the entire contract, not just the work encompassed by C.O. 24. The recognition of the loss was approved by Rockwell's outside auditors, Haskins & Sells, and was disclosed in note 3 of the company's 1969 financial statements:

In accordance with this policy, the Corporation charged in full to earnings for the 1969 year a loss on the F-111 avionics fixed-price-incentive contract. The loss reflected the reaching of a final agreement, after the end of the fiscal year, on the initial portion of that contract at a price less than the Corporation had anticipated in view of prior tentative agreements. The work

under the overall contract is about half completed, taking into account changes and additions. The Corporation believes that no further loss on the overall contract will be incurred, but future results of operations will necessarily be affected by actual developments as to cost performance and negotiations on the remaining portion of the contract.

Haskins & Sells also highlighted the loss in its opinion letter accompanying the financial statements, cautioning that "future results of operations will be affected to the extent [the contract] estimates may be subsequently revised."

Although we do not question the propriety of recognizing this loss for financial accounting purposes, we have serious reservations regarding petitioner's use of hindsight in determining the net realizable value of its inventories for tax purposes. The valuation process requires that we focus our attention on facts known or reasonably discoverable by the taxpayer *as of the inventory date.* Subsequent events which alter the inventory value and are not readily foreseeable by the taxpayer must be disregarded in order to preserve the integrity of the annual accounting concept. See, e.g., *United States Cartridge Co. v. United States,* 284 U.S. 511 (1932); *Sharp v. Commissioner,* 224 F.2d 920 (6th Cir. 1955); *Grays Harbor Motorship Corp. v. United States,* 71 Ct. Cl. 167, 213, 45 F.2d 259, 281 (1930), cert. denied 284 U.S. 627 (1931); compare *C-O-Two Fire Equipment Co. v. Commissioner,* 219 F.2d 57 (3d Cir. 1955). See also *Ithaca Trust Co. v. United States,* 279 U.S. 151 (1929) (similar rule applied in the context of an estate tax valuation). In deciding whether a subsequent event is sufficiently likely to occur so as to permit it to intrude on the valuation process, we also must bear in mind the Supreme Court's warning that "In the light of the well-known potential for tax avoidance that is inherent in inventory accounting, the Commissioner in his discretion may insist on a high evidentiary standard before allowing write-downs of inventory to 'market'." *Thor Power Tool Co. v. Commissioner,* 439 U.S. at 538. Fn. refs. omitted.

The record leaves no doubt that the settlement of the C.O. 24. controversy played a key role in the decision to write down the value of the P.O. 181 inventory. According to Clarence E. Blalock, who in 1969 was the manager of contracts and pricing of the SASD Division of Autonetics, and who recommended to Autonetics management that a $16,250,000 inventory write-

down be recorded for fiscal 1969, the crucial event which knocked the contract into a loss position was the unfavorable resolution of the C.O. 24 negotiations. He testified as follows:

> I had been pressed for some time for an indication of the amount of loss that the company was going to take that year, and I wanted to delay as long as possible to see what came out of Change Order 24 negotiations because that would turn it one way or the other. And as a consequence of waiting, I think that the much more accurate of the projections for the year was accomplished. We knew that this was imminent. It either had to—it had drug [sic] on for two and a half years, and it had to be resolved, and we felt that we had to wait and see how that came out before we could really make a solid projection of what the losses were going to be for the corporation.

Yet, while Rockwell may have been aware at yearend that these negotiations were rapidly drawing to a conclusion, the evidence shows that the eventual outcome was by no means readily foreseeable. The financial summary prepared on September 10, 1969, presented a number of estimates of the profit or loss expected to be realized when P.O. 181 was finally completed, but all of these estimates were based on the assumption that Rockwell would receive a $337,500,000 ceiling price on C.O. 24. Although the summary identified four different potential risks to the remainder (profit), the possibility of receiving a $321,250,000 ceiling was not among them. Petitioner insists that its outlook grew sharply pessimistic following the meeting with Air Force official Phillip Whittaker in late September, during which it received informal word that the Air Force intended to stick to a $321,250,000 negotiating position. However, we tend to discount the significance of this meeting because the October 11 financial summary characterized the difference in positions as only a "possible negotiation loss," even though Rockwell had received formal notification of the Air Force's position on October 7.

Furthermore, Robert N. Johnson, who was the manager of cost accounting at Autonetics during the time of the events in question, testified that until late October all members of Rockwell's management anticipated the successful negotiation of a $337,500,000 ceiling. During this period, Rockwell was also considering the possibility of litigating its right to a higher ceiling through the disputes process. It did not indicate its acceptance of the lower price in writing until November 1, and in the process, the company won significant concessions from the Air Force in the form of an increased progress-

payments percentage and the elimination of a proposed delivery penalty. It was not until *after* this matter was resolved that Rockwell officials decided to adjust the value of the P.O. 181 ending inventory. As a result, both of the estimates in the November 4 financial summary were prepared based on a $321,250,000 ceiling with respect to C.O. 24. Under these circumstances, we can only conclude that the outcome of the C.O. 24 negotiations was not readily foreseeable on the inventory date, and therefore, a loss estimate prepared after the ceiling price dispute was formally settled cannot be relied upon to support the reduced inventory valuation claimed by petitioner on its 1969 return.

The record reveals other material aspects of the contract which remained unsettled as of yearend and whose ultimate resolution would have a significant bearing on contract profitability. The September 10 financial summary, which as of September 19 was still Rockwell's best estimate of the financial status of P.O. 181, projected four possible outcomes on the overall contract, each one based on a different set of assumptions regarding (1) ongoing or future negotiations on C.O. 53, the ARS/IDS claim, and ceilings on additional P.O. 181 work, and (2) the estimated costs to be incurred in future COD work. The details of these areas of uncertainty are described more fully in our findings of fact, and it would serve no useful purpose to repeat them here. Suffice it to say that the negotiation of favorable target and ceiling amounts with respect to the first three matters would have two salutary effects. First, it would afford Rockwell some measure of protection against unforeseen cost overruns in completing the particular task involved. Second, in the event Rockwell was able to bring in the task at or below target cost, the unused ceiling on that portion of the contract would be available to offset cost overruns on some other portion of the contract, thereby enhancing overall contract profitability.

With regard to C.O. 53 and the ARS/IDS claim, Rockwell was uncertain at yearend as to the amount of compensation it would ultimately receive for the work performed. Thus, it projected values for target cost and ceiling price on C.O. 53 ranging from $25 million and $31 million, respectively, in the best case, to nothing in the worst case. Likewise, it projected a best-case negotiation on the ARS/IDS claim of a $38 million

target and $48 million ceiling, whereas in the worst case, it expected to get nothing. In addition, Rockwell estimated potential losses in negotiating ceiling rates for additional P.O. 181 work of up to $10 million. Its estimates of costs to be incurred in future COD work ranged from $14 million to $24 million. Based on the foregoing ranges of estimates, Rockwell derived the following projected outcomes on P.O. 181: worst case, $43,600,000 loss; conservative, $10,600,000 loss; most probable, $12,400,000 profit; and best case, $55,400,000 profit.

The October 11 financial summary also disclosed a number of still-to-be negotiated matters which left the overall contract ceiling price in a state of flux. The summary projected a best-case ceiling price on the entire contract of $846,100,000, but also listed potential negotiation losses amounting to $69,500,000 (including, for the first time, the potential loss on C.O. 24). The estimated costs at completion, including COD costs, were figured to be $792,900,000. Thus, the summary presented a best-case $53,200,000 profit and a worst-case $16,300,000 loss. Try as we might, we are simply unable to find, amidst these broad ranges of estimated profit and loss, the degree of certainty needed to justify a writedown of petitioner's inventory to its purported net realizable value on September 30.

It is true that in the November 4 financial summary, the best-case and worst-case outcomes were not quite so far apart. On the optimistic end of the scale a break-even was predicted, and on the other end, a $31,100,000 loss. The shorter swing between these two projections was partially due to the fact that the C.O. 24 dispute had been resolved by that time. Other contributing factors were the much narrower range of estimates on C.O. 53 and the ARS/IDS claim. No explanation was given at trial for the relatively sudden increase in confidence with which petitioner was able to predict the final outcome on these negotiations. We suspect, however, that the November 4 summary may have been tailored somewhat to provide a more convincing backdrop for management's decision to record a $16,250,000 loss for the fiscal year. In any case, to the extent that subsequent developments during the period from October 1 to November 4 were responsible for Rockwell's heightened precision, we again repeat that the proper point of reference for the valuation of inventories is the inventory date, and no

other. Consequently, it is our view that the financial summaries closest to that date are to be accorded the greatest weight in determining the propriety of petitioner's writedown.

Up to this point, with the exception of estimates pertaining to COD costs, we have dealt almost exclusively with uncertainties affecting the contract price. We turn now to another major source of imprecision inherent in petitioner's loss projection: the estimate of the remaining costs to completion. The financial summaries dated September 10 and October 11 did not disclose a range of estimated outcomes with respect to this variable, although they did list various estimates regarding future COD costs. The November 4 summary provided two estimates of costs at completion which were only $5 million apart (excluding COD estimates). We do not question the manner in which Rockwell compiled these estimates, nor do we question petitioner's assertion that these were the best estimates it could produce based on the information then available. Nevertheless, the record gives us ample reason to believe that the estimates were not sufficiently reliable to support an LCM writedown.

As we have indicated, when P.O. 181 was originally executed, the parties specified not-to-exceed amounts for the target cost and ceiling price of $132,132,000 and $171,771,000, respectively. The ceiling was computed at 130 percent of target cost and was intended to provide Rockwell with a buffer in the event of unforeseen cost overruns. Thus, it is evident that the parties recognized from the very outset that actual costs might well exceed the estimated or target costs. Subsequent events proved their fears to be well founded. Because of the highly sophisticated nature of the avionics systems and the state-of-the-art technology required for their development and manufacture, costs began to escalate sharply within a short time after Rockwell commenced performance. Numerous design and specification changes were requested by the Air Force, General Dynamics, and Rockwell, and by the time work on the contract was completed in fiscal 1976, a total of 442 change orders had been issued on P.O. 181. Of these, only 67 were issued as of September 30, 1969. Because of the multitude of specification changes, the addition of new contract work, and the problems Rockwell experienced in developing the necessary technology, its estimate of costs at completion (including

COD costs) had mushroomed from $132 million to $580,300,000 by the end of fiscal 1968. The financial summary dated September 10, 1969, listed estimated costs at completion ranging from $776,700,000 to $786,700,000. Less than 2 months later, the November 4 financial summary disclosed estimated costs at completion ranging from $801,700,000 to $811,700,000. When the contract was finally completed in 1976, some 6 years down the road, the actual costs incurred from its inception amounted to just over $855,300,000. These figures reveal a clear and persistent pattern of ever-increasing costs, brought about in part by cost overruns and in part by the addition of new work to the basic contract. Such a pattern makes it difficult for us to believe that petitioner could estimate its costs at completion with any real precision on September 30, 1969, particularly since the contract was estimated to be only 50-percent complete at that time.

As it turned out, petitioner's 1969 projections significantly underestimated the costs at completion. Based on the figures contained in the October 10 financial summary, its estimate of the costs remaining was approximately $374,500,000 ($792,900,000 estimated total costs less $418,400,000 costs incurred to date). When all was said and done, however, the actual figure proved to be roughly $436,900,000 ($855,300,000 less $418,400,000), or a difference of $62,400,000. Taken as a percentage of petitioner's estimate, this represents a variance of approximately 16.7 percent, a material deviation but certainly not surprising in view of the contract's turbulent history.

To be sure, petitioner's estimate erred on the side of conservatism since actual costs exceeded the predicted costs. Yet, this fact does not dispel our doubts as to the reliability of the estimate in the context of determining the true market value of petitioner's inventory. It must be remembered that the 375 change orders were not even issued as of yearend, let alone negotiated. Thus, although we have no way of knowing for certain, it is entirely possible that the cost variance was attributable to additional P.O. 181 work not contemplated by the parties when the estimate was prepared, rather than to cost overruns on work already on contract or in the process of negotiation. This possibility is supported by the fact that contract revenues also significantly exceeded petitioner's

estimates. To the extent that additional work was in fact responsible for the variance, a further dimension of uncertainty was injected into the estimation process. Since P.O. 181 contemplated only a single aggregate ceiling price equal to the sum of all the individually negotiated ceilings, any unused ceiling on a given task could be used to offset overruns on other portions of the contract. As a result, every addition of new work to the basic contract offered two more opportunities for improving *overall* contract profitability: (1) The opportunity to negotiate a favorable ceiling rate on the additional task, and (2) the opportunity to render a cost-effective performance, thereby permitting the unused ceiling to be applied elsewhere. Given this linkage between contract additions and overall contract profitability, and the substantial amount of work which remained to be negotiated, we do not think it unreasonable to require a greater degree of accuracy with respect to petitioner's estimate of the remaining costs to completion.

In concluding that petitioner's estimates of costs and revenues were too speculative to support a market writedown, we have also been influenced by two other facts. First, petitioner's own financial statements warned that its estimates were subject to change and that future results of operations would necessarily be affected by actual developments on cost performance and contract negotiations. Second, and perhaps more importantly, petitioner's outside auditors, after a careful evaluation of management's loss assessment, also deemed it necessary to disclose this possibility in their opinion letter accompanying the financial statements. This suggests to us that the persons who were in the best position to know believed that significant variations from their estimates were more than just a remote possibility.

Notwithstanding all this, petitioner argues that its estimates fell within the range of accuracy found to be acceptable by the courts in *Bliss* and *Space Controls*, and thus respondent's rejection of its estimates must be considered plainly arbitrary. We disagree. The facts of those cases are clearly distinguishable from the facts here presented. A crucial difference is that in both *Bliss* and *Space Controls* the selling prices for the contract merchandise were known quantities. There were no complicated negotiations in progress whose outcome would substantially impact on contract revenues, as

in this case. Nor did the contracts contain incentive provisions, such as those found in P.O. 181, whereby the overall contract price would vary depending on the contractor's actual costs at completion. Thus, in those cases, one of the two critical components of the loss assessment (the other being the estimated costs at completion) was essentially free from doubt on the relevant inventory dates.

Another distinguishing factor is the comparatively low level of uncertainty associated with the taxpayer's estimate of the remaining costs to completion. In *Bliss*, none of the custom-made presses was eligible for an LCM writedown until it was at least 50-percent complete. At that point, the costs yet to be incurred could be estimated with considerable precision since cost overruns were generally identified with the early stages of manufacture. Consequently, the taxpayer's loss estimate proved to be remarkably accurate (see note 27 *supra*). Similarly, in *Space Controls*, where the taxpayer had incurred approximately 68 percent of the total contract costs by yearend, prompting the Fifth Circuit to refer to the contract as "substantially completed," the actual costs at completion only marginally exceeded the taxpayer's estimate (see note 24 *supra*). Additionally, in both *Bliss* and *Space Controls*, the inventory which was written down was completed and shipped the following year. By contrast, P.O. 181 was only about half completed at yearend, and 6 years elapsed before the final deliveries were made. Furthermore, change orders for a significant portion of the work ultimately performed were not issued or negotiated by the parties until after yearend. Finally, by the time the contract was completed, *both* costs and revenues had substantially exceeded petitioner's 1969 projections.

Petitioner attempts to minimize the significance of these factual differences by observing that the net loss ultimately realized on P.O. 181 ($9,826,000) was only $6,424,000 less than the predicted loss. This, petitioner asserts, constitutes proof of the reasonableness of its estimates and places it within the realm of accuracy tolerated in *Bliss* and *Space Controls*. In our judgment, this argument misses the point. Certainly, the amount ultimately realized on the sale of inventory is a factor to be considered in determining whether a taxpayer's estimate of net realizable value reasonably reflected its actual value on

the inventory date. Thus, the Fifth Circuit has stated, "While subsequent events are not determinative of a fact on a given date prior thereto, that which occurred * * * confirms what would have been a reasonable expectation at that time." *Space Controls, Inc. v. Commissioner*, 322 F.2d at 155 n. 24; *St. James Sugar Co-op, Inc. v. United States*, 643 F.2d 1219, 1225 (5th Cir. 1981). The regulations similarly provide that actual sales by the taxpayer on or near the inventory date will be used to measure the correctness of the estimated value. See secs. 1.471-2(c), 1.471-4(b), Income Tax Regs. This does not mean, however, that a fortuitous correlation between the estimated value and the amount subsequently realized will automatically shield the writedown from the Commissioner's challenge. Given the number of years remaining on the contract, the fact that it was only half completed, the fact that actual costs and revenues significantly exceeded the taxpayer's estimates, and the magnitude of the uncertainties which prevailed on the inventory date regarding both contract costs and revenue, we think that the relatively small spread between the actual and projected outcomes (relative, that is, to total contract costs) can only be viewed as the product of a coincidence, and any comparision between the two is superficial and misleading. We hold, therefore, that petitioner has failed to establish by sufficient objective evidence that its P.O. 181 ending inventory had a value which was less than its cost on September 30, 1969. Accordingly, no inventory writedown is permissible under the terms of section 1.471-4(b), Income Tax Regs.[29]

Petitioner vigorously contends that the writedown should be allowed because it was required under GAAP in order to state fairly the results of its operations for the fiscal year. Judging from the expert testimony elicited at trial and a review of the pertinent accounting pronouncements of the American Institute of Certified Public Accountants (AICPA), we are satisfied

---

[29]We wish to emphasize that, under petitioner's professed method of accounting for P.O. 181, estimated losses were to be reported through writedowns of ending inventory, and not on a pro rata basis as finished end items were delivered during the year. Thus, even under a straightforward application of its own method of accounting, petitioner would not be entitled to deduct the portion of the $16,250,000 loss which was properly allocable to the cost of units delivered during 1969, assuming, as we hold here, that the loss was not otherwise allowable under the LCM rules. In any event, because of the uncertainties inherent in petitioner's loss projection, we would be unable to conclude that respondent acted arbitrarily in refusing to allow even a partial writedown based on actual deliveries.

that GAAP did require recognition of the entire estimated loss on P.O. 181, and respondent has not disputed this point. We are not at all convinced, however, that the requirement of immediate recognition stems from the application of the LCM inventory rules (see note 22 *supra*). Rather, it appears to derive from a broader principle which favors full recognition of contract losses in the first year they are susceptible to estimation regardless of the extent to which the related costs have been incurred as of the yearend.[30] As in the case of the LCM rules, the rationale for this principle can be found in the doctrine of conservatism and the accountant's pervasive fear of misleading the users of the company's financial statements as to its true financial condition.

In any case, the Supreme Court has made it explicitly clear that a method of accounting which is in accord with GAAP does not necessarily clearly reflect income for purposes of sections 446(b) and 471. In *Thor Power* the taxpayer argued that conformity with GAAP created a presumption of the validity of its inventory method for tax purposes, citing sections 1.446–1(a)(2) and 1.471–2(b), Income Tax Regs., but this argument was firmly rejected by the Court. In commenting on the relative importance of the twin requirements of section 471 (i.e., conformity with GAAP and clear reflection of income), the Court stated that the goal of clearly reflecting income must be considered "paramount" given the Commissioner's discretionary authority under section 446(b) to reject any method of accounting which does not meet that standard. 439 U.S. at 540. Furthermore, the Court concluded that the "vastly different" objectives of financial and tax accounting

---

[30]See generally AICPA Industry Audit Guide, "Audits of Government Contractors," p. 20 (1975); AICPA Statement of Position 81–1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts," par. 85–89 (published July 15, 1981, and reproduced as appendix I of the AICPA Audit and Accounting Guide, "Construction Contractors" (1981)). It is true that Statement of Position (SOP) 81–1 states, as a general proposition, that "the characteristics peculiar to long-term contract methods of income recognition do not require the accounting for contract costs to deviate from the basic accounting framework applicable to inventories or business enterprises in general." See Statement of Position, *supra* at par. 71. Nevertheless, there is no indication that the LCM valuation rules are intended to play any role whatsoever in taking estimated contract losses into income. SOP 81–1 simply states that anticipated losses based on estimates of contract costs and revenue must be given immediate recognition and are to be reflected on the balance sheet as either a current liability or as an offset against the accumulated contract costs. See Statement of Position, *supra* at pars. 85, 89.

rendered unacceptable any presumptive equivalency between the two (439 U.S. at 542–543):

> Third, the presumption petitioner postulates is insupportable in light of the vastly different objectives that financial and tax accounting have. The primary goal of financial accounting is to provide useful information to management, shareholders, creditors, and others properly interested; the major responsibility of the accountant is to protect these parties from being misled. The primary goal of the income tax system, in contrast, is the equitable collection of revenue; the major responsibility of the Internal Revenue Service is to protect the public fisc. Consistently with its goals and responsibilities, financial accounting has as its foundation the principle of conservatism, with its corollary that "possible errors in measurement [should] be in the direction of understatement rather than overstatement of net income and net assets." In view of the Treasury's markedly different goals and responsibilities, understatement of income is not destined to be its guiding light. Given this diversity, even contrariety, of objectives, any presumptive equivalency between tax and financial accounting would be unacceptable.
>
> This difference in objectives is mirrored in numerous differences of treatment. Where the tax law requires that a deduction be deferred until "all the events" have occurred that will make it fixed and certain, *United States* v. *Anderson,* 269 U.S. 422, 441 (1926), accounting principles typically require that a liability be accrued as soon as it can reasonably be estimated. Conversely, where the tax law requires that income be recognized currently under "claim of right," "ability to pay," and "control" rationales, accounting principles may defer accrual until a later year so that revenues and expenses may be better matched. *Financial accounting, in short, is hospitable to estimates, probabilities, and reasonable certainties; the tax law, with its mandate to preserve the revenue, can give no quarter to uncertainty. This is as it should be. Reasonable estimates may be useful, even essential, in giving shareholders and creditors an accurate picture of a firm's overall financial health; but the accountant's conservatism cannot bind the Commissioner in his efforts to collect taxes.* \* \* \* [Fn. refs. omitted; emphasis added.]

The instant case falls squarely within the purview of the Supreme Court's reasoning. While it may have been entirely appropriate, from the standpoint of financial accounting conservatism, to use "estimates, probabilities, and reasonable certainties" in reporting the projected loss on P.O. 181, the same cannot be said of their use in determining petitioner's Federal taxable income. To sanction the deduction of an unrealized contract loss based on the scanty objective evidence disclosed in this record would grant petitioner an impermissible measure of discretion in determining its taxable income during the years spanned by such contracts. Furthermore, it is the Commissioner, not the taxpayer, to whom Congress has

given the authority to determine whether a particular inventory practice clearly reflects income. Consequently, we hold that petitioner's inventory writedown did not clearly reflect income for the year in issue and respondent's determination to that effect was not plainly arbitrary.[31]

Next, we will address briefly petitioner's alternative contentions regarding the propriety of its writedown outside the context of the inventory valuation rules. First, proceeding on the assumption that the P.O. 181 costs were not inventoriable, petitioner argues that the recognition of the estimated loss nevertheless constituted a permissible method of accounting because it resulted in a clear reflection of income. We disagree. To begin with, petitioner's argument suffers from the same fundamental defect that it did in the inventory arena: the estimates upon which the loss projection was based were too uncertain to permit recognition of the entire loss or even the portion of such loss properly allocable to the cost of units delivered during the taxable year. Furthermore, we reiterate the point expressed earlier that the LCM rules under section 471 constitute a strictly limited exception to the general rule prohibiting the deduction of unrealized losses. Once the costs incurred under a contract are placed outside those rules, no loss may be deducted on the contract until there is actual realization as evidenced by closed and completed transactions. See *Lucas v. American Code Co.*, 280 U.S. 445 (1930); *Ewing-Thomas Converting Co. v. McCaughn*, 43 F.2d 503 (3d Cir. 1930), cert. denied 282 U.S. 897 (1931); *Hesse v. Commissioner*, 74 T.C. 1307 (1980); *C. F. Mueller Co. v. Commissioner*, 40 B.T.A. 195 (1939); sec. 1.165–1(b) and (d)(1), Income Tax Regs. In the context of this case, this requirement could only be satisfied by the delivery of finished merchandise with respect to which both cost and selling price are readily ascertainable. Thus, on this record, we are convinced that the deduction of the anticipated loss prior to realization did not result in a clear reflection of income as required by section 446(b), and accord-

---

[31]Accordingly, we need not pass on the merits of respondent's argument to the effect that Rockwell failed to value its inventory on an "article-by-article" basis as required under sec. 1.471–4(c), Income Tax Regs. Similarly, we do not address respondent's other arguments which allege inconsistent application of petitioner's stated method of accounting for P.O. 181.

ingly, we hold that respondent did not abuse his discretion in disallowing it.

Petitioner's second argument is that respondent has been stripped of his discretionary authority under section 446(b) to reject its method of accounting because of his failure to suggest an alternative method. In other words, petitioner views section 446(b) as imposing an affirmative obligation on respondent to replace petitioner's defective method with an acceptable substitute. Petitioner contends that since respondent failed to discharge this obligation,[32] he is precluded from challenging petitioner's method of accounting whereby all projected contract losses are deducted in full in the year they are first susceptible to estimation.

We read section 446(b) somewhat differently than petitioner. The statute provides that if the taxpayer's method of accounting · does not clearly reflect income, "the computation of taxable income shall be made under such method as, in the opinion of the Secretary * * * , does clearly reflect income." This empowers the Commissioner to recompute taxable income for a *specific taxable year* under a method which, in his judgment, will clearly reflect income. The statute does not require the Commissioner to inform the taxpayer what method of accounting it should follow in *subsequent* taxable years with regard to the item or items in controversy. In the instant case, respondent determined that the deduction of the P.O. 181 estimated loss (by way of an inventory writedown or any other method of accounting) did not clearly reflect petitioner's taxable income. Respondent further determined that the proper method of accounting for the loss, i.e., the method

---

[32]The notice of deficiency was noncommittal in this regard; it merely stated that petitioner's work-in-process inventory as reported on its 1969 return was being increased by $16,250,000 to reflect the "disallowed estimated loss claimed on the F–111 contract." In a letter to respondent's counsel dated May 30, 1980, petitioner expressly requested guidance as to the proper method of accounting for the estimated contract loss. By letter dated July 8, 1980, respondent declined petitioner's invitation, stating that he was under no obligation to name an acceptable alternative method. On brief, however, respondent appears to suggest that it would have been appropriate for petitioner to report the estimated loss in the same manner it reported estimated profits (i.e., by reporting a pro rata portion of the loss based on deliveries during the taxable year), but only if there was sufficient objective evidence to fix the amount of such loss. Respondent's Opening Brief at 84–85 and Reply Brief at 37. Respondent also indicated that the completed-contract method of accounting (described in sec. 1.451–3, Income Tax Regs.) would have been an appropriate method of reporting the contract loss. Respondent's Opening Brief at 79–83.

which would clearly reflect income for that particular taxable year, was simply to take none of the loss into income, currently. In so doing, we think respondent properly exercised the discretionary authority conferred on him by the statute. As we see it, respondent was under no obligation to give petitioner guidance as to how and when the estimated loss was to be reported in future taxable years.

Accordingly, we hold that the writedown was not otherwise allowable as a deduction assuming petitioner was not entitled to inventory its costs under P.O. 181.

Finally, we note that in its petition Rockwell requested an award for the cost of reasonable attorney's fees. This contention was not pursued at trial or on brief and therefore we deem it abandoned. In any event, we have held that this Court does not have the authority to make such an award. See *Key Buick Co. v. Commissioner*, 68 T.C. 178 (1977), affd. 613 F.2d 1306 (5th Cir. 1980).

To reflect our conclusions herein,

*Decision will be entered for the respondent.*